ATLAS BUILDING PRODUCTS CO.,
Appellant,

v.

DIAMOND BLOCK & GRAVEL CO.,
Appellee.

No. 5990.

United States Court of Appeals
Tenth Circuit.

Aug. 17, 1959.

John P. Eastham, Albuquerque, N. M., and J. F. Hulse, El Paso, Tex. (of the firms of Scott, Hulse, Marshall & Feuille, El Paso, Tex., and Rodey, Dickason, Sloan, Akin & Robb, Albuquerque, N. M.) for appellant.

Dee C. Blythe, Clovis, N. M., and James T. Martin, Jr., Las Cruces, N. M., for appellees.

Before MURRAH, PICKETT and BREITENSTEIN, Circuit Judges.

MURRAH, Circuit Judge.

This is an appeal from a judgment for triple damages in a private antitrust suit, laid under Section 2(a) [1] of the

---

[1]. "It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States * * * and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly re-

Clayton Act, as amended by the Robinson-Patman Act, 49 Stat. 1526, 15 U.S.C.A. § 13(a).

The allegations are that the plaintiff-appellee, Diamond Block & Gravel Company, is a manufacturer and seller of cinder concrete building blocks to the building trade in Las Cruces, New Mexico and vicinity; that the defendant-appellant, Atlas Building Products Company, manufactures and sells the same products in El Paso, Texas and vicinity, where it has a virtual monopoly; and that it also sells those products to the building trade in Las Cruces and vicinity. The crux of the charge is that commencing in 1950, and continuing to the filing of this suit, the defendant has systematically sold its products in Las Cruces at prices actually lower than its comparable El Paso sales; that it employed its highest El Paso prices to finance its price war against competitors in New Mexico, including the plaintiff; that such practices constitute price discriminations between different purchasers, the effect of which may be to lessen competition or tend to create a monopoly in commerce in building blocks, or to injure, destroy or prevent competition by the plaintiff with the defendant, and with persons who received the benefit of such discriminations, or with customers of either of them. The appellee then alleged that as a result of the acts complained of, it had been injured in its business in the sum of $200,000, for which it prayed judgment, to be tripled as required by law, and for reasonable attorney fees.

The appellant moved to dismiss the complaint for failure to state a claim upon which relief could be granted under Section 2(a), and upon denial pleaded, first, that its pricing policies were not discriminatory, but if so, they were made in good faith to meet an equally low price of a competitor within the meaning of Section 2(b), 15 U.S.C.A. § 13(b).[2] The case was submitted to the jury on the theory that the burden was upon the plaintiff to show by a preponderance of the evidence that the defendant did in the course of commerce, directly or indirectly, discriminate in price between different purchasers of concrete cinder building blocks of like grade and quality; that price discrimination in the statutory sense means the giving to one of the purchasers an advantage in price not accorded or given to other purchasers. The jury was specifically told that a price discrimination as thus defined was not alone sufficient to sustain a claim under Section 2(a), for to be actionable, the evidence must show a "reasonable possibility" of a substantial lessening of competition or tendency to create a monopoly, or injure, destroy or prevent competition with any person who grants or receives the benefit of such discrimination. Thus, the jury was instructed that "a price discrimination may exist if a seller exacts different prices from its customers * * * where one leg of the price differential is across state lines and this differential affects or has a tendency to affect competition in the ways I have mentioned"; and that "the jury has the right to consider any difference in prices charged in El Paso, Texas on the one hand, and prices exacted by it [the defendant] in Dona Ana County, New Mexico [Las Cruces] on the other."

The defendant objected to all of these instructions and to refusal of the court to instruct the jury that to be actionable under Section 2(a), the price discrimination must be between different purchasers in direct competition with each other; and that the court therefore erroneously permitted the jury to consider the difference in the defendant's prices in El Paso

---

ceives the benefit of such discrimination, or with customers of either of them * * *."

2. Section 2(b) pertinently provides:
"That nothing contained in sections 12, 13, 14–21, and 22–27 of this title shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor."

on the one hand, and Las Cruces on the other.

■ Thus, we have squarely presented the question whether the prohibitions of Section 2(a) are applicable to price discriminations between different, but noncompeting, purchasers of products of like grade and quality. The appellant takes the position that geographic price differentials or discriminations between noncompeting purchasers in different localities are not actionable under Section 2(a), but only under Section 3 of the Robinson-Patman Act, for which a private cause of action under Section 4 admittedly does not lie. And see Nashville Milk Co. v. Carnation Co., 355 U.S. 373, 78 S.Ct. 352, 2 L.Ed.2d 340; and Safeway Stores, Inc. v. Vance, 355 U.S. 389, 78 S.Ct. 358, 2 L.Ed.2d 350.

In the first place, there is nothing in the statute to indicate that its prohibitions are restricted to price discriminations between competing purchasers in the same area. The statute is not couched in terms of locality. See Corn Products Refining Co. v. Federal Trade Commission, 324 U.S. 726, 734, 65 S.Ct. 961, 89 L.Ed. 1320. The purpose of this Section as an integral part of the anti-trust legislative scheme is to prevent price discriminations in commerce which tend to injure competitive enterprise. To that end, it forbids a seller from charging different customers different prices for the same products with the effect of lessening competition. And, we know that market power is a ready means toward competitive injury. See Sen.Rep. 1502, 74th Cong., 2 Sess., 4 (1936); H.R. Rep. 2287, 74th Cong., 2 Sess., 8 (1936); 80 Cong.Rec. 9417 (1936). Furthermore, geographic price discrimination between noncompeting purchasers was asserted and sustained under both Sections 2(a) and 3 in Moore v. Mead's Fine Bread, 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145. Indeed, the court pointed out that such practices were prohibited under the Clayton Act even before the Robinson-Patman Amendment, citing Porto Rican American Tobacco Co. of Porto Rico v. American Tobacco Co., 2 Cir., 30 F.2d 234, 237.

The court was sure that "Congress by the Clayton Act and the Robinson-Patman Act barred the use of interstate business to destroy local business, outlawing the price cutting employed by respondent." [348 U.S. 115, 75 S.Ct. 151.] It went on to quote from a statement of Congressman Utterback, one of the Managers of the Robinson-Patman Amendment, that "Where, however, a manufacturer sells to customers both within the State and beyond the State, he may not favor either to the disadvantage of the other * * *." And see also Maryland Baking Co. v. Federal Trade Commission, 4 Cir., 243 F.2d 716.

■ It is agreed that Section 2(a) of the Clayton Act and Section 3 of the Robinson-Patman Act "overlap in some respects", but are in no way inconsistent with each other. Section 2(a) provides a civil remedy by way of triple damages, while Section 3 imposes criminal penalties for some but not all of the same infractions. Section 3 is specific in its interdictions of geographic price discriminations, while Section 2(a) is broader to prohibit the same practices between different purchasers wherever located, whether competing or not, when the effect of such discrimination may substantially lessen competition or tend to create a monopoly in any line of commerce. Antitrust legislation is concerned primarily with the health of the competitive process, not with the individual competitor who must sink or swim in competitive enterprise. But as a necessary incident thereto, it is concerned with predatory price cutting which has the effect of eliminating or crippling a competitor. For, surely there is no more effective means of lessening competition or creating monopolies than the debilitation of a competitor.

Our case is clearly distinguishable from suits by a local purchaser against a manufacturer, where competition between purchasers is of course essential to actionable price discrimination. See Naifeh v. Ronson Art Metal Works, D. C., 117 F.Supp. 690, affirmed D.C., 218 F.2d 202; Klein v. Lionel Corp., 3 Cir.,

237 F.2d 13; Shaw's v. Wilson-Jones Co., 3 Cir., 105 F.2d 331. Our case is also, we think, distinguishable on facts from Balian Ice Cream Co. v. Arden Farms Co., 9 Cir., 231 F.2d 356, in which, while the interstate manufacturer discriminated in price between different purchasers in distant localities, the difference in the price was held not to substantially lessen competition or tend to create a monopoly in the product sold. In short, the conclusive finding of the trial court negated the existence of any prohibited consequences or the possibility thereof.

■ The same legal issue was before the Seventh Circuit in Anheuser-Busch, Inc. v. Federal Trade Commission, 265 F.2d 677, where the court was presented with the basic question whether uniform local price cuts by an interstate manufacturer which disrupted the market to the injury of local competitors, were price discriminations within the proscription of Section 2(a). The court held that even though directed at local competitors, the price cuts were not discriminatory, apparently because they did not discriminate among local competitors. This conclusion is apparently based upon the theory contended for here that the statutory words "different purchasers" means competing purchasers. We respectfully reject any such restriction upon Section 2(a). For, we are convinced that geographic price discriminations employed for predatory ends are cognizable under either Section 2(a) or Section 3, and it was therefore not error for the court to tell the jury that they might consider differences in price in El Paso County, Texas, and Dona Ana County, New Mexico, in determining whether the defendant was guilty of actionable price discrimination.

■ As thus construed and applied, the appellant says that the statute is so vague and indefinite as to be incapable of observance in circumspect human conduct, and is therefore fatally defective for want of due process. But we do not think the generalized language of Section 2(a) is any less definite and certain in the standards of conduct it proscribes than the restraint of trade and monopolization provisions of Sections 1 and 2 of the Sherman Act, the criminal sanctions of which have long since been sustained as against the claim of unconstitutional vagueness. See Nash v. United States, 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232. "The law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree." Id., 229 U.S. at page 377, 33 S.Ct. at page 781. Other related provisions of the antitrust laws of equally vague import have withstood the constitutional test. See F. & A. Ice Cream Co. v. Arden Farms, D.C., 98 F.Supp. 80; Elizabeth Arden, Inc. v. Federal Trade Commission, 2 Cir., 156 F.2d 132.

This brings us to the sufficiency of the facts to sustain the charge, and we think they are adequate.

It seems to be agreed that the appellant's prevailing El Paso prices to dealers and contractors during the period in question were 24¢ per standard block, less 10 per cent, plus 1½¢ delivery charge, or a delivered price of 23.1¢. And, there was evidence from which the jury was justified in finding that during the same period the appellant's Las Cruces delivered price was 20¢, including a 3¢ haulage charge. There were variations in the prices to dealers and contractors, but the 20¢ delivered price was generally applicable to the principal building contractors. There was evidence to the effect that from the early part of 1952, when the appellee commenced business, it sold cinder blocks of the same grade and quality to the building trade for 23¢ per block, less 10 per cent, plus 1½¢ haulage, or a net of 22.2¢ delivered price; that in some instances it gave a 12 per cent discount to large contractors, or a net of 21.74¢; that in May 1953, the price was changed to 24¢, less 10 per cent, plus 1½¢ haulage, or a net of 23.1¢ delivered price. There was testimony to the effect that in April or May 1952, the contractors who had been purchasing blocks from appellee at the

foregoing prices inquired whether it could meet a 20¢ delivered price; that thereafter appellee did sell blocks for two or three houses to one principal builder for 20¢ delivered price, but was forced to discontinue sales at this price; that this builder and other builders thereupon ceased to purchase blocks from appellee and thereafter purchased all of their blocks from the appellant.

The appellant points to the fact that it sold much of its blocks through its dealers in Las Cruces and vicinity, and that those dealers sold blocks retail always in excess of 24¢, and sometimes as much as 27¢; that the appellee was actually in competition with appellant's dealers, between which there was no price discrimination; that the appellee was unable to compete for the contractors' trade because of its inability to supply their requirements due to lack of plant facilities and raw materials, production problems, failure to make special types of blocks needed in the building industry, wasteful increase in production costs, lack of sales organization, failure to maintain sufficient inventory, and other economic factors disabling the appellee from supplying the market demand in its trade area.

There was evidence that during the prosecution period, the appellant sold $162,000 worth of blocks in the Las Cruces area for prices in excess of 24.1¢, but the evidence also showed without much dispute that during the same period, it sold $603,163 worth of blocks at prices lower than 24.1¢ in the same area. From this it is reasonable to say, as did the jury, that the appellant discriminated in prices between its purchasers in El Paso and its purchasers of the same class in the Las Cruces area.

As we have seen, the jury was emphatically told that only price discriminations resulting in proscribed harmful effects were actionable. But the jury was also told, rightly we think, that in determining the presence or absence of the harmful effects, if any, it could consider the size of the appellant and its economic power in the area in which it operates, the amount of blocks sold by appellant as compared to the amount sold by appellee, and the comparative prices at the consumer level, that is, the level of contractor and retail sales; and that they should take into consideration the reasons given by purchasers for purchasing appellant's or appellee's blocks. In that connection, however, the jury was advised that the antitrust laws were never intended as an "instrument to stifle or prevent competition, or as a means to create monopolies." That, "While its primary purpose was to give some measure of protection to the small business, as against unlawful practices by strong and powerful competitors, it does not exclude or preclude the large business from entering into any field and competing legitimately with others engaged in a like business enterprise." Thus, the jury was told that if the appellee failed to prove by a preponderance of the evidence that the price discriminations, if any, had reasonably possible harmful effects as outlined in the statute, the verdict must be for the appellant.

There was testimony that the appellant's 20¢ delivered price to the principal contractors deprived the appellee of its "bread-and-butter" business and prevented it from enlarging its plant facilities to take care of the demand, or to pursue a vigorous sales policy. There was evidence that in a healthy market the appellee could have enlarged its plant within a short time to enable it to compete for the business of the principal contractors in this particular area.

It is significant, we think, that the appellant was the largest manufacturer and supplier of cinder concrete blocks in this territory. It enjoyed a virtual monopoly in El Paso County, and possessed the dominant market power in nearby counties in New Mexico, including Dona Ana County. In this setting, it is fairly inferable that the appellant utilized its higher El Paso prices to stifle competition with its lower prices in the Las Cruces area. In other words, that the appellant utilized its dominant market power for predatory ends. It was

not error, therefore, for the trial court to instruct the jury that in determining the tendency of the price discriminations to substantially lessen competition and create a monopoly, they could consider the size of the appellant, its economic power and its comparative prices to purchasers in the El Paso and Las Cruces areas. Cf. Moore v. Mead's Fine Bread, supra; United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236.

■ In defense of its pricing policy, appellant refers to a sale of pumice blocks by a competitor, not the appellee, for 20¢ delivered price, and indicates that its 20¢ delivered price was made to meet an equally low price of a competitor. But the evidence shows that the 20¢ delivered price was an isolated sale and arose through a misunderstanding between the purchaser and the supplier. In any event, the jury was told that even though they believed by a preponderance of the evidence that the appellant did discriminate in price, if they were satisfied by the same preponderance of the evidence that such discrimination was in good faith and only to meet an equally low price of a competitor, their verdict should be for the appellant, so long as the price reduction was not below the competitor's low price. And see Standard Oil Co. v. Federal Trade Commission, 340 U.S. 231, 71 S.Ct. 240, 95 L.Ed. 239. We think these instructions, considered together, correctly state the antitrust law applicable to these facts.

■ As we have seen, the jury was positively instructed that appellant's price discriminations, if any, were actionable if there was a "reasonable possibility" of a substantial lessening in competition or tendency to create a monopoly. The appellant objected to the use of the words "reasonable possibility", insisting that the court should have required a showing of a "reasonable probability" of the proscribed effect on commerce.

The use of both phrases to mean the same thing in Corn Products Co. v. Federal Trade Commission, supra [324 U.S. 726, 65 S.Ct. 967], has provoked considerable discussion concerning the authoritative choice of the two to define the statutory phrase "may be substantially to lessen competition * * *" which, in our judgment, needs no definition. Federal Trade Commission v. Morton Salt Co., 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196; E. Edelmann & Co. v. Federal Trade Commission, 7 Cir., 339 F.2d 152; Whitaker Cable Corp. v. Federal Trade Commission, 7 Cir., 239 F.2d 253; Moog Industries v. Federal Trade Commission, 8 Cir., 238 F.2d 43. But whatever may be said for the use of the words "reasonable probability" as a basis for judicial action (see Mr. Justice Jackson dissenting in Federal Trade Commission v. Morton Salt Co., supra), the fact remains that for good or bad, the Supreme Court has deliberately adopted "reasonable possibility" over the more positive "reasonable probability" to indicate the required quantum of proof to show the prohibited harm. Federal Trade Commission v. Morton Salt Co., supra.

While the court did tell the jury that reasonable possibility of harmful results was sufficient, it did emphasize that such harm must not be "imaginary or illusive". We cannot say that the trial court erroneously used the phrase "reasonable possibility" instead of "reasonable probability".

■ The appellant also complains of the refusal of the trial court to give its requested instructions on proximate cause. But the jury was told clearly and unmistakably that even though it should find that the appellant's pricing policies amounted to actionable price discrimination, the burden was on the appellee to establish by a preponderance of the evidence that the losses, if any, were proximately caused by such price discriminations; that loss of business occasioned by inability to achieve or maintain an adequate inventory, inability to deliver its products to purchasers, by shut downs in its plant, failure of material and supplies, or failure to bid on business or solicit purchases, could not be attributable to the appellant's pricing pol-

icies; and if, therefore, the jury found that the loss of business was caused by any of these factors or by legitimate competition, their verdict should be for the defendant. The jury was instructed in language too clear for doubt that there must be a causal connection between the losses sustained, if any, and the unlawful acts of the appellant. Under these instructions we think the question of proximate cause was properly submitted to the jury. And see Story Parchment Co. v. Paterson Parchment Co., 282 U.S. 555, 51 S.Ct. 248, 251, 75 L.Ed. 544.

The ascertainment of requisite damages to the appellee's business and property was submitted to the jury on the theory that it was incumbent on the appellee to prove such damages with reasonable certainty, not by guess and conjecture. But, "If the damage is certain, the fact that its extent is uncertain does not prevent a recovery." Story Parchment Co. v. Paterson Parchment Co., supra. See also Kobe, Inc. v. Dempsey Pump Co., 10 Cir., 198 F.2d 416; Leader Clothing Co. v. Fidelity & Casualty Co. of N. Y., 10 Cir., 237 F.2d 7; Wells Truckways v. Burch, 10 Cir., 247 F.2d 194; Bigelow v. R. K. O. Radio Pictures, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652.

■ On the question of damages and the amount thereof, the appellee relied on the testimony of one of its partners, who produced the records of the Company on sales and cost of production, and who also testified concerning the appellee's sales policies in the Las Cruces area in its attempts to compete with the appellant. Generally, the testimony reflected an increased cost of production commensurate with decreased production resulting from diminished sales. A public accountant analyzed the appellee's production cost and computed the amount of business the appellee might reasonably be expected to receive if El Paso prices (i. e. 21.6¢ f. o. b.) had prevailed, and from that projected the appellee's profits

but for the price discrimination. A manufacturer's agent, familiar with the block building business, and particularly the production methods and procedures prevalent in the business, testified that the appellee could have expeditiously enlarged its production facilities to meet the demand and compete for its fair share of the business in a flourishing market. The accounting procedures employed by the appellee to show damages were not as satisfactory as the trial court thought they should have been, but that they were sufficient. We agree that the evidence tended to show that as a result of the appellant's pricing policies, the appellee had been deprived of business which it would have reasonably been expected to obtain under prices generally prevailing in the El Paso area; and that as a result of the loss of this business, its profits dwindled, its cost of production increased, and the value of its business was diminished.

■ In that regard the jury was instructed that in determining damages it might consider as one of the elements, any profits that may have been lost by appellee in its business; and that it might also consider as another element of damages the extent to which the value of appellee's profit or the net worth of its assets had been diminished as a result of the price discrimination. The appellant objected to this instruction on the ground that it permitted the jury to assess double damages for one wrongful act.

The statute speaks of injury to "business or property". And see Section 4 of the Clayton Act, 38 Stat. 731, 15 U.S. C.A. § 15.[3] And, those words in their ordinary sense have been construed in terms of (1) the difference, if any, between the amounts actually realized by the injured party and what it would have reasonably expected to realize from sales but for the unlawful acts complained of; and (2) the extent to which the value of the petitioner's property had

---

3. Section 4 provides in material part: "Any person who shall be injured in his business or property by reason of any-

thing forbidden in the antitrust laws may sue therefor * * *."

been diminished as a result of such acts. See Story Parchment Co. v. Paterson, supra; Kobe, Inc. v. Dempsey Pump Co., supra; Bigelow v. R. K. O. Pictures, supra. We think both loss of profits in business and diminishment of the assets were proper elements of damage, and the trial court did not err in so submitting the case to the jury.

■ The appellant also challenges the testimony of the accountant and the manufacturing agent as wholly outside the scope of the case and the knowledge of the witnesses, and as based upon hypothetical facts having no basis in the evidence and contrary thereto. Much of the accountant's testimony was of doubtful relevance, and the court excluded parts and confined other parts within narrow range. We think in the last analysis the weight and probative value of the testimony they gave concerning the amount of damages was for the jury under instructions of the court.

■ As the trial court observed, the jury award of $10,000 was "very moderate" under the proof of the amount of sales and the worth of the business involved. We have recently restated the general rule that "on a motion for directed verdict upon the ground of the insufficiency of the evidence to take the case to the jury on the crucial issue or issues of fact, the evidence and the inferences fairly to be drawn from the evidence must be considered in the light most favorable to the party against whom the motion is directed. And if the evidence and the inferences fairly drawn therefrom—viewed in that manner—are such that reasonable minded persons in the exercise of fair and impartial judgment may reach different conclusions upon the crucial issue or issues of fact, the motion should be denied and the question submitted to the jury." Transcontinental Bus System, Inc. v. Taylor, 10 Cir., 265 F.2d 913. See also Linn v. Ula Uranium, Inc., 10 Cir., 265 F.2d 916; Story Parchment Co. v. Paterson, supra. We agree with the trial court that the evidence, considered in its entirety, is sufficient to support the judgment of the court, and it is affirmed.