**ANHEUSER–BUSCH, INC., a Missouri corporation, Petitioner,**

v.

**FEDERAL TRADE COMMISSION,**
Respondent.[1]
No. 12284.

United States Court of Appeals
Seventh Circuit.

Jan. 25, 1961.

1. To dispel some expected confusion, we shall refer to the above-named petitioner as AB and to the above-named respondent as the Commission.

Edgar Barton, New York City, Charles M. Price, Chicago, Ill., for petitioner.

Francis C. Mayer, Atty., Federal Trade Commission, Washington, D. C., for respondent.

Before DUFFY, SCHNACKENBERG and KNOCH, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

In reversing our prior decision, 265 F.2d 677, the Supreme Court, 363 U.S. 536, at page 542, 80 S.Ct. 1267, 4 L.Ed. 2d 1385, limited the nature of its inquiry, because we had held only that the threshold statutory element of price discrimination had not been established. While the Court concluded that the evidence warranted the Commission's finding of price discrimination, it explained, at page 549, 80 S.Ct. at page 1274, that a price discrimination within the meaning of § 2(a) [2] is merely a price difference, and stated, at page 550, 80 S.Ct. at page 1275, that the statute itself spells out the conditions which make a price difference illegal or legal. The Court made it plain at page 542, at page 1270 of 80 S. Ct. that, having held that a price difference existed within the meaning of § 2(a), it was remanding the case to this court to consider whether the record supported a finding of the requisite competitive injury, whether AB's good faith defense was valid, and whether the Commission's order was unduly broad. It intimated no view upon these aspects of the controversy.

The Supreme Court, at page 553, 80 S.Ct. at page 1277, disclaimed any flat prohibition of price differentials, recognizing that price differences constitute but one element of a § 2(a) violation.

Before the hearing examiner, upon the Commission's conclusion of its case in support of its complaint, AB's counsel moved to dismiss the complaint for failure to prove "(a) that the alleged practices tended substantially to lessen competition * * * or to injure * * * competition * * * within the meaning and intent of said Section 2(a) * * *, and (b) that the Commission has failed to prove a prima facie case under the allegations of the complaint."

In denying the motion, the examiner said that the Commission had "a mighty slim case here as it now stands", and that he was going to hear from AB's side. He then heard AB's defense and the Commission's rebuttal. The examiner's initial decision, in which he made findings of fact and concluded that AB had violated § 2(a) as charged, was slightly modified and adopted by the Commission.

Having made a painstaking review of the record, including all of the evidence upon the issue of requisite competitive injury, we herein specifically refer to certain facts, because of their significance on this remandment.

Section 2(a) makes it unlawful to discriminate in price

" * * * where the effect of such discrimination *may be substantially to lessen competition* or tend to create a monopoly in any line of commerce, *or to injure, destroy, or prevent competition* with any person who either grants or knowingly receives the benefit of such dis-

2. 15 U.S.C.A. § 13(a).

crimination, or with customers of either of them * * *." (Italics supplied.)

The gains and losses in the shares of the St. Louis packaged beer market commencing before and ending after AB's price reductions of January 4 and June 21, 1954, expressed in percentages of sales as divided among AB, Griesedieck Brothers (GB), Falstaff, Griesedieck Western (GW) and "All Others", are set forth in the following tabulation:

|  | Dec. 31 1953 | June 30 1954* | March 1 1955 | July 31 1955 | Jan. 31 1956 [3] |
|---|---|---|---|---|---|
| AB | 12.5 | 16.55 | 39.3 | 21.03 | 17.5 |
| GB | 14.4 | 12.58 | 4.8 | 7.36 | 6.2 |
| Falstaff | 29.4 | 32.05 | 29.1 | 36.62 | 43.2 |
| GW | 38.9 | 33. | 23.1 | 27.78 | 27.3 |
| All Others | 4.8 | 5.82 | 3.94 | 7.21 | 5.8 |

* The entire packaged beer sales in the St. Louis market during the six months ending June 30, 1954 increased 2.7%' over the same period for 1953.

This tabulation shows that AB's overall market increase in the St. Louis market area from December 31, 1953 to February 1, 1956 was 5% of the said market, while Falstaff's was 13.8% thereof.

In 1953 AB stood in fourth place in the St. Louis market and in 1956 it was in third place, having displaced GB.[4] While GW at all dates shown in the table led AB in the St. Louis market, with the exception of March 1, 1955, its relatively low rating of 23.1% at that date is explainable by unique circumstances.[5]

At the hearing before the examiner, counsel for the Commission made it clear that no claim was made that the statutory effect on competition resulted from the January 4, 1954 drop in price by AB.

Outside of St. Louis, Falstaff had eight different breweries and grew from sixth to fourth largest brewer in the United States from 1954 to 1955; its beer was sold in 26 states in the West, Midwest, South and Southeast. GB was sold in 13 states, and, indeed, as was true with each of the other beers, it was found that more than three-quarters of its sales were outside St. Louis. GW was sold in 20 states.

While AB sells its Budweiser beer throughout the United States and has

3. The trial examiner found that regardless of the cut-off date used, July 31, 1955 or January 31, 1956, competition was lessened or injured. In order to determine the actual effect on competition, a statistical period must extend a reasonable time beyond the alleged illegal price reduction in order that all factors affecting the market may come into play. The tabulation becomes more comprehensive.

4. The hearing examiner's finding reveals: GB's sales were progressively declining in the St. Louis market from a share thereof in 1950 of 18% to 14.4% in 1953. In 1953 it replaced the beer it had theretofore been selling with an entirely new product which was badly named, poorly merchandised, bitter in taste and "wild"—that is with un-

stabilized air content. AB offered the testimony of eleven saloonkeepers and storekeepers that this new beer was disliked by the consumer with the result that consumer sales thereof dropped sharply during the latter part of 1954.

5. GW had been progressively losing sales in the St. Louis market prior to 1954. Its management had been maintaining a highly liquid cash position at the expense of renewal or replacement of productive facilities. In October 1954, GW was sold to Carling Brewing Company (a subsidiary of Canadian Brewers, Ltd., which owned 18 breweries throughout the United States and Canada), at a price which reflected the good will to be about one-fifth of realizable net worth.

ranked first or second in national sales, it has never accounted for more than about 7% of such sales and is not first in any major market in the United States. Rather, competitors such as Falstaff, GW and GB dominate most markets, just as they dominated St. Louis with 82.7% of sales.

Although the hearing examiner found that AB's position in the St. Louis market had increased from sixth to fourth from 1945 to 1953, the fact is that at all these times AB was in *last* place in St. Louis, the number of brewers having decreased from six to four by reason of mergers, none of which involved AB.

In the fall of 1953, after an increase in costs due to a new wage contract, AB increased the price of Budweiser 15¢ a case in all markets except those in Missouri and Wisconsin. In many areas this small increase was multiplied by wholesalers' and retailers' markups to $1.20 a case at the retail level.

Despite similar cost increases due to the same new wage contracts, a number of brewers, including Falstaff and AB's other St. Louis competitors, chose to absorb the increased costs, and did not raise prices in any market in which they did business. Their right to do so is not challenged. However, as a consequence, there was a spread between the price of Budweiser and the price of other beers in markets other than in Missouri and Wisconsin. In some cases this spread was created by this increase, but in most cases a preexisting spread was increased. As a result, in November and December 1953, AB began to suffer severe sales losses in the Midwest sales area, supplied by its St. Louis brewery—losses as high as 73% in Nebraska, 53% in Oklahoma, 58% in Texas, etc. In some states AB's sales were down as much as 83% below the previous year; and while industry sales were down only 8%, AB's sales were more than 35% below the previous year.

AB contends that it was obvious that something had to be done to correct the situation. The question was *what* should be done.

AB tried to roll back its price increase in one area, Ohio—but found, as it had anticipated, that the retailers and wholesalers were unwilling to give up their total additional markup of $1.20 per case merely because AB reduced its price 15¢ per case.

The first price reduction in St. Louis went into effect on January 4, 1954 and amounted to 25¢ per case. This still left the price of Budweiser 33¢ higher than the prices of its three principal competitors in St. Louis. All St. Louis brewers sold directly to retailers, and there were no wholesalers' markups to concern them. Furthermore, AB's home office was in St. Louis, and by a direct effort it was able to convince 85% of the retailers there to pass on the price reduction to consumers. Thus the problem of wholesalers' and retailers' markups was not present in St. Louis as it was elsewhere. Moreover, from a freight standpoint, AB was one of the few brewers who attempted to sell throughout the United States from one or two brewing sites. For example, in the area served by AB's single St. Louis brewery, Falstaff had seven breweries and intensely cultivated the area within about 300 miles of each of those seven, resulting in an estimated annual saving of $1,000,-000. If AB reduced its price in an area where it had no plant, it would have to pay high freight costs from St. Louis and compete with the regional brewery getting its products from a local plant. Accordingly, all four named brewers there had at least one local plant so that none of them was faced with a freight disadvantage.

While the January 4, 1954 new price was in effect, AB also increased its advertising expenditures in St. Louis, which theretofore had been a fraction of its competitors' advertising. AB also changed its method of solicitation and delivery of orders to the system used by all of its St. Louis competitors and changed the organization of its sales force.

Despite all these changes, AB's national sales continued to decline. Then, on June 21, 1954, the second price reduction of Budweiser in St. Louis was made, the new price being the same as its three competitors had been, and were then, charging for their beers, or, as the complaint states, the price of beer "exactly matched the established price charged for beer" by the St. Louis competitors. In addition AB continued its efforts to solve its sales problem. Early in 1954, it considered proposals for reducing the capacity of its containers. On March 1, 1955, it marketed a new brand of beer to be priced competitively with its dominant competitors in the various markets, but this beer proved to be a failure. It then raised the price of Budweiser 45¢ per case and the St. Louis competitors raised their price by 15¢ a case, making Budweiser 30¢ higher-priced than its competitors. The record fails to reveal the fate of a different and cheaper beer introduced by AB in August, 1955.

1. While it is true that AB's sales increased in St. Louis during the period of the price reductions,[6] a fact which alone surely cannot constitute a violation of § 2(a), nevertheless AB's competitors still controlled more than three-fourths of market sales in the twelve months after the price of Budweiser was voluntarily increased in St. Louis in March, 1955. While Budweiser and other premium beers were selling at the same price in St. Louis, buyers had a greater freedom of choice at the same price level and thus the contest for beer sales was intensified.

During the 1954–1955 price reductions, AB's St. Louis competitors continued to sell in St. Louis at the same price at which they had previously sold. None of them lost retail customers; each continued to sell to the same retailers to whom it had always sold; and each continued to sell at the same prices at which it had previously sold. Each continued to

make profits—Falstaff, for example, earned almost $7,000,000 in 1954. Each continued to vary its competitive activities, e.g., changing the formula of its products, changing its labels, varying its advertising, offering special price promotions, entering new markets, etc.

The record reveals only a temporary shift in volume of business among the competitors in the St. Louis market. Although AB did attain a monthly average of 36.6% of sales during the eight months of the second price reduction, nevertheless this was not as great a share of the market as its leading competitors obtained before or after the price reduction. Whatever position AB obtained was temporary; by 1956 its sales had receded to 17.5% of the market, whereas Falstaff at that time had increased to 43% of the market from the 29.4% it had enjoyed before the price reductions.

The examiner expressly found that there was no proof that AB used income or profit from the rest of its business to stabilize losses in St. Louis, or indeed, that there were any losses by AB in St. Louis during the period of the price reductions.

AB's two price reductions were parts of an experimental program of sales promotion in the St. Louis market and the reductions were temporary and made necessary by competitive conditions. A primary result of AB's price reductions was that the consumers of beer in St. Louis enjoyed a lower price on Budweiser, since the price reductions were passed on to them by the retailers.

While AB's two price reductions undoubtedly contributed to moderate changes in the division of the beer sales in the St. Louis market, there was also a causal connection between those changes and (a) GW's and GB's special problems, at page 837, (b) Falstaff's gain of 13.8% of the market and (c) a 1% gain by "All Others".

6. As indicated, at page 837, AB's sales increase was equal to 5% of the St.

Considering that the Commission relied on a percentage test, no one is able to determine from this record how much of the losses of AB's competitors was attributable to these special facts as compared to any losses resulting solely from AB's price reductions.

■ From these undisputed facts we find that the Commission failed to prove that AB's price reductions in 1954 caused any present, actual injury to competition.

2. We recognize that the heart of our national economic policy is faith in the value of competition. The Supreme Court has said that, in the Sherman and Clayton Acts, 15 U.S.C.A. §§ 1–7, 15 note, 12 et seq., as well as in the Robinson-Patman Act, Congress was dealing with competition, which it sought to protect, and monopoly which it sought to prevent. Standard Oil Co. v. Federal Trade Commission, 1951, 340 U.S. 231, 248–249, 71 S.Ct. 240, 95 L.Ed. 239.

■ The use of different prices in different markets in the beer industry is, in itself, a proper method of competition. This use is not in issue here. However, we are concerned with the question of whether the effect of reductions by AB in its established prices in only *one* market *may* be substantially to lessen or injure competition and thereby violate § 2(a), as contended by the Commission. As a preliminary to this question, we have set forth rather fully the facts as to what occurred in the St. Louis market.

■■ The Act is really referring to the effect upon competition and not merely upon competitors. Atlas Building Products Co. v. Diamond Block & Gravel Co., 10 Cir., 1959, 269 F.2d 950, 954, certiorari denied 363 U.S. 843, 80 S.Ct. 1608, 4 L.Ed.2d 1727. In this respect § 2(a) must be read in conformity with the public policy of preserving competition, but it is not concerned with mere shifts of business between competitors. It is concerned with substantial impairment of the vigor or health of the contest for business, regardless of which competitor wins or loses. The competition which is sought to be protected by this section is a contest between sellers for the buyer's business, because, "competition is, in its very essence, a contest for trade". United States v. Standard Oil Co. of New Jersey, D.C.E.D.Mo.1931, 47 F.2d 288, 297; Balian Ice Cream Co. v. Arden Farms Co., D.C.S.D.Cal.1952, 104 F. Supp. 796, 801, affirmed 9 Cir., 1955, 231 F.2d 356, certiorari denied 350 U.S. 991, 76 S.Ct. 545, 100 L.Ed. 856. "Competition * * * is a battle for something that only one can get; one competitor must necessarily lose." Sinclair Refining Co. v. Federal Trade Commission, 7 Cir., 1921, 276 F. 686, 688, affirmed 261 U.S. 463, 43 S.Ct. 450, 67 L.Ed. 746. "Antitrust legislation is concerned primarily with the health of the competitive process, not with the individual competitor who must sink or swim in competitive enterprise." Atlas Building Products Co. v. Diamond Block & Gravel Co., supra, 269 F.2d at page 954. See also Whitaker Cable Corporation v. Federal Trade Commission, 7 Cir., 1956, 239 F.2d 253.

3. Against this background of established law we consider the Commission's reliance on Corn Products Refining Co. v. Federal Trade Commission, 1945, 324 U.S. 726, 65 S.Ct. 961, 89 L.Ed. 1320. In that case, 324 U.S. at page 738, 65 S. Ct. at page 967, the Court pointed out

"* * * § 2(a) does not require a finding that the discriminations in price have in fact had an adverse effect on competition. * * * It is enough that they 'may' have the prescribed effect. * * * the use of the word 'may' was not to prohibit discriminations having 'the mere possibility' of those consequences, but to reach those which would probably have the defined effect on competition."

In Corn Products, a manufacturer of glucose sold its products to *competing* candy manufacturers having factories in Kansas City and Chicago. The sales were only at delivered prices, computed by adding to a base price at Chicago the published freight tariff from Chicago to the several points of delivery, even

though deliveries were in fact made from a factory at Kansas City, as well as from its Chicago factory. Thus there was included in the price on shipments from Kansas City a "phantom" freight charge unrelated to any proper element of actual cost. Glucose being an ingredient of low-priced candy, the Court upheld the Commission's decision based upon an inference of a reasonable probability that the effect of the discrimination may be substantially to lessen competition. It also upheld the Board's finding of discrimination against Corn Products on a charge that, following a price increase, it permitted certain favored customers to take delivery at former lower prices for periods longer than those permitted to other customers, and on a charge that Corn Products granted certain discounts to favored purchasers of its by-products. Also held discriminatory was an arrangement by Corn Products with one customer for paying advertising expenditures to promote the use of the former's products in candy manufactured by that customer.

The very nature of the discriminations found against Corn Products showed *ipso facto* an adverse effect upon many of its buyers, some of whose competitors received the benefits of the discriminations. In addition, evidence was introduced to establish an inference of a reasonable probability that the effect of the discriminations may be substantially to lessen competition. This was a secondary-line competition case, as distinguished from the case at bar which is a primary-line case. However, Corn Products is helpful, in considering the case at bar, because it recognizes that the statutory effect on competition, present or future, must be established to support the Commission's order against AB. While a well-grounded finding of substantial actual present injury might with other facts be a basis for a finding of a reasonable probability or possibility of future adverse effect, we have already

determined, at page 840, that the Commission's finding of actual present injury is not sustained by the evidence in this record.

4. In this court, the Commission takes the position that this proceeding was designed to stop a predatory pricing practice. It thereupon attempts to bring our problem into focus by asserting that this is the classic, territorial price discrimination set forth in its own report to the 74th Congress. What the Commission identifies as leading cases on this subject we shall now discuss.

In Moore v. Mead's Fine Bread Co., 1954, 348 U.S. 115, 75 S.Ct. 148, 99 L. Ed. 145, Mead, which engaged in an interstate bakery business, competed in Santa Rosa, New Mexico, with Moore, a local baker. When the Santa Rosa merchants agreed to purchase Moore's products exclusively, Mead cut in half the wholesale price of its bread in Santa Rosa but not in Texas where it also had a bakery. As a result of this price war, Moore was forced out of business. It was held that Mead's price cut was a violation of § 2(a) of the Clayton Act, as amended.

In Maryland Baking Co. v. Federal Trade Commission, 4 Cir., 1957, 243 F. 2d 716, Maryland made a price cut of about 25% on an ice-cream cone in a limited area where a small competitor had its only operation. There was evidence that the price cut was initiated for the purpose of driving the competitor out of business and that it thereby lost about half of its business in this product. The court affirmed a cease and desist order of the Commission.[7]

In E. B. Muller & Co. v. Federal Trade Commission, 6 Cir., 1944, 142 F.2d 511, the Commission found that Muller sold granulated chicory to customers in the New Orleans trade area in competition with R. E. Schanzer, Inc., its only competitor, at or slightly below cost, while maintaining higher prices elsewhere

7. In approving the order, the court of appeals modified it by providing that it would not require uniform prices throughout the country nor forbid the respondent making prices in good faith to meet competition.

which enabled the business as a whole to show a profit. Much evidence sustained the Commission's finding of a deliberate intention on Muller's part to eliminate Schanzer as a competitor by cutting prices in violation of the Act.

In Porto Rican American Tobacco Co. v. American Tobacco Co., 2 Cir., 1929, 30 F.2d 234, the court held that American, in reducing its price of cigarettes to that of the cheaper brand of Porto Rican, a local manufacturer, operated at a loss to punish and, if possible, eliminate Porto Rican as a competitor, thus violating § 2 of the Clayton Act.

The Commission cites Balian Ice Cream Co. v. Arden Farms Co., 9 Cir., 1955, 231 F.2d 356, but admits that the court there held that Arden, in reducing prices in one geographic area for the purpose of meeting competition, was excused under the meeting competition defense. In its supplemental brief on remand, the Commission again cites Balian, in support of a contention which is not relevant on the point we now discuss.

The Commission also cites Atlas Building Products Co. v. Diamond Block & Gravel Co., 10 Cir., 1959, 269 F.2d 950, 956, certiorari denied 363 U.S. 843, 80 S.Ct. 1608, 4 L.Ed.2d 1727. Atlas sold building blocks in the El Paso, Texas, market and in the adjoining Las Cruces, New Mexico area where it competed with Diamond, a local firm. Atlas lowered its prices in the Las Cruces area to a level below the price at which Diamond could profitably operate, thereby utilizing its "dominant market power for predatory ends". A judgment for Diamond was affirmed.

■ Turning now to the situation at bar, we find that, there being no showing that AB had aid from its other markets [8]

and despite a decrease in its national sales,[9] AB forthrightly met its robust competition in the St. Louis market by a multiple-pronged program,[10] which included but was not limited to a two-step reduction in its price to exactly meet that of its competitors. The record affirmatively shows that AB used restraint in its competitive efforts. Its conduct was in conformity with the principle that competition is the decisive force in the market place. That conduct is the antithesis of the predatory misconduct condemned in the above territorial pricing cases relied on by the Commission. In each of those cases the motive for the price cut was vindictive and the effect was punitive. There was not even a pretense that the price change was incident to a general intensification of the sales effort, as in the case at bar. It was a single lethal weapon aimed at a victim for a predatory purpose.

5. The Commission relies heavily upon finding 26 in the initial decision of the examiner, which includes the following statements:

"* * * we are here concerned not only with actual injury but with potential injury as well, and there is nothing in this record to show that what A.B. did in the St. Louis market, could not or would not be done by it, in the future, in other markets as well. * * * A.B. has total assets of more than twice those of its three St. Louis brewery competitors, and, selling nation-wide as it does, is able, *although there is no proof that it did,* to use income or profit from the rest of its business to stabilize losses, if any, incurred in such a price raid. I repeat, there is *no showing that it did, but* the record shows *it could*—the potentiality is there. * * * "[11] (Italics supplied.)

---

8. Finding 26 of the initial decision. See page 842.

9. Its total sales were off more than 1,000,000 cases in May and 1,500,000 cases in June 1954. These followed successive declines in national sales for each

preceding month in 1954 and for November and December 1953.

10. See page 838.

11. The examiner's language confusingly refers to both the alleged *acts* of AB and

■ It is true that the effects of AB's acts on competition might have been different from what they actually were and that nevertheless it could be held to account under § 2(a) for what actually happened as well as the reasonably possible effects thereof.[12] But, to prove the *acts* themselves, the Commission was required to adduce evidence of what AB *did* and a finding of a violation cannot rest upon a conjecture as to what it *might do*. Potentiality to commit an act cannot be used as a substitute for proof of the act itself. While it has been said that every person has a little larceny in his heart, not even a cynic would attempt to procure a conviction on that ground alone. Nor are we convinced that guilt of an alleged malefactor can be proved by only its bigness.[13] The Commission's argument that the "over-all size of the interstate enterprise" of AB "is significant, for it enables a seller to engage in area price discriminations without fear of severe monetary loss to itself", is met by the examiner's finding 26, *supra*, that there was no proof that AB had employed its size to support its price reductions.

6. In addition to claiming that it has proved *actual* injury to AB's competitors and competition, the Commission says, in effect, that, if it did *not* succeed in so proving, its order should nevertheless be sustained because "§ 2(a) does not require a finding that the discriminations in price have *in fact* had an adverse effect on competition", citing, *inter alia*, Corn Products Refining Co. v. Federal Trade Commission, supra, at page 840.

The Commission quotes therefrom, 324 U.S. at page 738, 65 S.Ct. at page 967:

" * * * The statute is designed to reach such discriminations 'in their incipiency,' before the harm to competition is effected. It is enough that they 'may' have the prescribed effect. * * * "

■ The application in the case at bar of this language would require a projection to ascertain the future effect of the price reductions made by AB. The reliability of this projection would depend in part upon whether weight is given to the nature of the activity of the party engaged in the alleged discriminatory action. If it is using its competitive power fairly in the market place and respecting the rights of its competitors, then no forecast of future adverse effects on competition based on those facts is valid. If, on the other hand, the projection is based upon predatoriness or buccaneering,[14] it can reasonably be forecast that an adverse effect on competition *may* occur. In that event, the discriminations in their incipiency are such that they *may* have the prescribed effect to establish a violation of § 2(a). If one engages in the latter type of pricing activity, a reasonable probability may be inferred that its willful misconduct may substantially lessen, injure, destroy or prevent competition. However, in this case, we find that AB exercised a proper restraint in its use of its competitive power, not a willful misuse thereof. Thus it cannot be said that such a proper use of price reductions *may* produce these adverse results to competition an;

the alleged *effects* of those acts. In our comments we shall attempt to differentiate between the two.

12. In Federal Trade Commission v. Morton Salt Co., 1948, 334 U.S. 37, 46, 68 S.Ct. 822, 828, 92 L.Ed. 1196, the court said:

" * * * we have said that 'the statute does not require that the discriminations must in fact have harmed competition, but only that there is a reasonable possibility that they "may" have such an effect.' *Corn Products* [Refining] Co.

v. *Federal Trade Comm'n*., 324 U.S. 726, 742 [65 S.Ct. 961, 969, 89 L.Ed. 1320]."

13. If bigness be a disqualification for a firm to compete, interesting collateral questions arise, such as, how small does a company have to be before it has the right to enter into price competition with its competitors? And how large does it have to be before it must stop competing in price?

14. The meaningful word "buccaneering" is used by the Supreme Court, 363 U.S. at page 549, 80 S.Ct. at page 1274.

more than it can be logically maintained that a powerful drug, used under a physician's supervision to alleviate human pain, may, if misused, injure or kill a person.

7. It becomes unnecessary for us to consider whether AB's § 2(b) defense [15] of good faith in meeting an equally low price of a competitor was valid or its contention that the Commission's order was unduly broad.

From our review of the entire record and for the reasons hereinbefore set forth, we conclude that the inferences on which the findings of the Federal Trade Commission were based are so overborne by evidence calling for contrary inferences, as set forth in this opinion, that the findings of the Commission cannot, on the consideration of the whole record, be deemed to be supported by substantial evidence. Therefore, the cease and desist order issued by the Commission on September 10, 1957 is set aside.

Order set aside.