SHORE GAS AND OIL COMPANY, Inc., a New Jersey corporation, Plaintiff,

v.

HUMBLE OIL & REFINING COMPANY, a corporation of the State of Delaware, Defendant.

Civ. No. 753-61.

United States District Court
D. New Jersey.
Dec. 17, 1963.

Giordano & Giordano, West End, N. J. (John C. Giordano, Jr., West End, N. J., and Norman H. Mesnikoff, Asbury Park, N. J., of counsel), for plaintiff.

Stryker, Tams & Dill, Newark, N. J. (Burtis W. Horner, Newark, N. J., of counsel), for defendant.

LANE, District Judge:

This is an action for treble damages under Section Two of the Clayton Act, as amended by the Robinson-Patman Act.[1] Plaintiff, Shore Gas and Oil Company, Inc. [hereinafter "Shore"] alleges that defendant, Humble Oil & Refining Company [hereinafter "Humble"] violated the Clayton Act by making discriminatory sales of gasoline which caused injury to "primary" or seller's line competition.

Both parties are in accord on the facts of this case except insofar as they pertain to the asserted affirmative defense of "good faith meeting of competition." They agree that this case is ripe for summary judgment if this court finds that defendant should prevail regardless of the outcome of the affirmative defense. We do so find. For purposes of the pending motion, the relevant facts are not at issue and a trial would be superfluous.

Shore is a distributor of Cities Service petroleum products in Monmouth and Ocean Counties, New Jersey. Humble is a distributor of Esso products in Monmouth and Ocean Counties as well as a producer, manufacturer and distributor of petroleum products in many other places, both within and without the State of New Jersey. All suppliers, including both Shore and Humble, have an estab-

---

1. 49 Stat. 1526 (1936), 15 U.S.C. § 13(a) (1958), amending 38 Stat. 730 (1914).

lished base or list price, called the "posted consumer tank wagon price." At the time the events which led to this action occurred, the posted consumer tank wagon price of regular-grade gasoline charged by all suppliers in the area, including both Shore and Humble, was $.165 per gallon, exclusive of all taxes. All suppliers including Shore and Humble have, however, supplied or offered to supply various governmental or commercial customers in Monmouth County with gasoline at various prices below the prevailing consumer tank wagon price. For example, in bid business during 1961 under varying cost situations Shore bid as much as $.04 below the posted consumer tank wagon price (sealed bid, municipal account, firm price), American as much as $.041 below, Cities Service $.0423, Sinclair $.0417, and Humble $.0527.

The Asbury Park Radio Cab Company [hereinafter "Cab Co."], consuming in its business about 50,000 gallons of regular-grade gasoline per year, was a customer of Shore prior to July 1961. On July 12, 1961, a contract was entered into between Cab Co. and Humble wherein Humble agreed to sell regular grade gasoline to Cab Co. at the posted consumer tank wagon price, less $.036 per gallon or $.129 while the 1961 consumer tank wagon price was in effect. During this period, Shore's lowest price to a commercial account was $.137 per gallon. Because of Humble's lower price bid, Shore lost the Cab Co. account and the profit it would have thus otherwise enjoyed.

The Monmouth and Ocean County, New Jersey, gasoline market is highly competitive. Eleven different producers sell gasoline through no less than seventeen distributors in the area. It is common for a buyer to change his supplier affiliation because he can get better price, goods, service, et cetera, from another. Both parties gained and lost various accounts to and from competitors in 1961, at least in part because of price competition. Humble lost accounts to competitors even though charging as low as $.0306 below (lost to Cities Service) and $.0431 below (lost to Gulf).

Neither does Shore aver nor do the undisputed facts suggest that Humble's purpose in the transaction complained of was other than an attempt to gain additional profitable business. It is clear, furthermore, from the arguments put forth that Shore does not contend that a standard of higher prices by Humble was the factor enabling it to offer this low price to Cab Co.

---

There are five basic elements which must be established to maintain a cause of action under Section 2(a) of the Robinson-Patman Act:[2]

1. That defendant has discriminated in price among purchasers of goods of like grade and quality

2. in interstate commerce

3. thereby causing

4. requisite competitive injury

5. and no affirmative defenses are available to the defendant.

■ The parties are in apparent agreement about element number one. The product of concern in the instant case is regular gasoline sold to purchasers of goods of "like grade and quality." Humble has sold it at different prices to different such customers. It is clear that

2. The pertinent text: "It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States * * * where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them. * * *" [Citation at footnote 1, supra.]

if a defendant charges two different prices for similar goods, he is discriminating in price within the meaning of the Act. "[A] price discrimination within the meaning of [Section 2(a)] is merely a price difference." [3]

Elements number two, four and five are contested. Assuming Shore prevails on all three issues, namely: (2) that the sales are in interstate commerce, (4) that there is the requisite injury to competition, and (5) that defendant's claimed affirmative defense of "good faith meeting of competition" is without merit, Shore must still succeed on the issue of causation. Since the discrimination here was not the cause of the alleged competitive injury, plaintiff has fallen short of establishing his case.

While the Robinson-Patman Act requires that the proscribed injury must in all cases be the "effect" of a discrimination in price for relief to be forthcoming,[4] the way in which the discrimination causes the injury may differ, depending upon the kind of injury resulting.[5]

In the common "secondary" or buyer's line injury case, the causal relationship between discrimination and injury to competition is obvious: defendant's difference in price to buyers places the one discriminated against at a competitive disadvantage, consequently prejudicing fair, vigorous competition in the affected market. The simplicity of this causal relationship has resulted in a dearth of secondary line cases which consider the meaning of the "effect" language. Seri-

ous problems of construction do not arise in this regard.[6]

The situation in primary-line injury cases is quite different.[7] Causation, which is equally essential for a cause of action, is more subtle and difficult to discern. Injury is not an "effect" of discrimination directly. Rather it is the result of a low price which a discrimination in price allowed the defendant to charge. High prices provide for the predatory defendant the profit margins with which to lower other prices and undercut competitors. The existence of a difference is essential to the injury. The injury is an effect of the discrimination.

Contrariwise, if there is no relationship between high and low prices, the low prices and consequent competitive injury are not the "effect" of price discrimination.

In most primary-line injury litigation, the price discrimination is territorial in nature: higher prices in geographic markets available solely or primarily to the discriminating seller subsidize his lower prices in the affected market. Thus there is a relationship between high and injurious low prices to sustain a finding that the injury is the "effect" of the discrimination. Case holdings are not often rooted in this statute's causation language. It is worthy of note, however, that in the history of territorial discrimination litigation as it is reflected in the cases which have been brought to this court's attention,[8] "aid from other mar-

3. Federal Trade Commission v. Anheuser-Busch, Inc., 363 U.S. 536, 549, 80 S.Ct. 1267, 1274, 4 L.Ed.2d 1385 (1960).

4. This is the requirement of the statute itself. Certain price discrimination is unlawful only "where the effect of such discrimination may be substantially to lessen competition, [etc.]." See text of the statute, supra, footnote 2.

5. See generally Rowe, Price Discrimination under the Robinson-Patman Act (1962), comparing pp. 163 et seq. with pp. 182 et seq.

6. The way in which discrimination causes secondary line injury is clear. Certain

secondary line injury cases, however, present fact situations in which it is not clear whether injury to competition actually resulted from the discrimination or from other factors. Rowe, supra footnote 5, at pp. 182 et seq.

7. The case at bar contains allegations of primary line injury only, i. e. Shore, as a seller of gasoline, claims injury to competition among sellers as a result of seller Humble's price discrimination.

8. Cf. cases cited in Anheuser-Busch, Inc. v. Federal Trade Commission, 289 F.2d 835, 841–842 (7th Cir. 1961).

kets"[9] is always a material factor accompanying the granting of relief.[10] And in at least two territorial cases in which relief was withheld, the court specifically found that no such aid from other markets was present.[11]

■ Thus, it is the general rule in territorial primary-line injury cases that to establish the necessary causative link between the price difference and the injury to competitors and competition, it must be shown that high prices aided the injurious low prices and enabled defendant to charge them. Conversely, if no relationship is shown between prices in the low price area and prices in other areas, the injured party's case fails for lack of causation.[12]

■ Where, as in the instant case, haphazard individual prices at varying levels are offered in a single geographic market for the purpose of competitively gaining particular business accounts[13] and primary-line injury is claimed, the principles of causation are essentially similar to those of territorial price discrimination. Other territories whose high prices will support low ones do not exist, but there are other high prices to purchasers of like commodities in the

same territory which will serve a similar purpose for the discriminating seller. When a seller underbids a competitor, thereby injuring him, the injury is an "effect" of discrimination only if the low price is supported by other prices and their profits, wherever charged. Otherwise, the low price alone has caused the injury and the price discrimination is but incidental. Thus if it is shown that the low bid is below cost, it is fairly inferrable that profits made on other prices financed the complained-of low price.[14] If the price is completely self-sufficient, it may be inferred that no relationship between high and low prices exists, and therefore that the discrimination had not the proscribed "effect."[15]

More than the language of the statute or inferences which can be drawn from the judicial history of its interpretation dictate our insistence that causation be established. The Act's proscription of competitive injury which is the "effect" of a price discrimination gives the discriminating seller a yardstick by which he can measure the legality of a price before he institutes it. It is not beyond practicality to require him to examine the price he is about to charge and deter-

9. I. c. higher prices in one territory subsidizing lower prices in another.

10. Moore v. Mead's Fine Bread Co., 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145 (1954); Atlas Building Products Co. v. Diamond Block & Gravel Co., 269 F.2d 950 (10th Cir. 1959); Maryland Baking Co. v. Federal Trade Commission, 243 F.2d 716 (4th Cir. 1957); E. B. Muller & Co. v. Federal Trade Commission, 142 F.2d 511 (6th Cir. 1944); Porto Rican American Tobacco Co. of Porto Rico v. American Tobacco Co., 30 F.2d 234 (2d Cir. 1929), cert. denied, 279 U.S. 858, 49 S.Ct. 353, 73 L.Ed. 999 (1929); H. J. Heinz Co. v. Beech-Nut Life Savers Inc., 181 F.Supp. 452 (S.D.N.Y.1960).

11. Only one of these cases cited "effect" language in making this observation, Balian Ice Cream Co. v. Arden Farms Co., 231 F.2d 356, 367 (9th Cir. 1955), the other referred to lack of the prohibited competitive injury, Anheuser-Busch, Inc. v. Federal Trade Commission, 289 F.2d 835, 842 (7th Cir. 1961).

12. Rowe, Price Discrimination under the Robinson-Patman Act, (1962), pp. 166–168.

13. Referred to as "catch-as-catch-can" pricing by Edwards, The Price Discrimination Law, (1959), and as "secret concession" pricing, Note, 74 Harv.L.Rev. 1597 (1961).

14. E. B. Muller & Co. v. Federal Trade Commission, supra footnote 10, at pp. 517–518 of 142 F.2d. Sales below cost indicate aid from other prices, but it is not necessarily true that they would conclusively prove "effect," or that the causal relationship may only be proved by sales below cost. Sales below cost may be financed by resources other than high profit margins. See Rowe, supra, footnote 12.

15. But see Samuel H. Moss, Inc. v. Federal Trade Commission, 148 F.2d 378 (2d Cir. 1945, per curiam), cert. denied, 326 U.S. 734, 66 S.Ct. 44, 90 L.Ed. 438 (1945), as modified by 155 F.2d 1016 (2d Cir. 1946). See criticism in Edwards, supra footnote 13, pp. 468–485.

mine whether it will be self-sufficient. If he finds the price independent of other prices, he can charge it without fear of primary-line injury and resulting treble-damage suits. If on the other hand he finds that the price will be supported and subsidized by other prices, he knows that he may be held responsible for consequent injury to competition.

If a mere low price causing injury is held within the Act, however, a discriminating seller is unable to predict whether a low individual price he is about to charge will subject him to legal sanctions. Though the statute requires that any resulting injury must be anti-competitive, this does not present the seller with a meaningful gauge of the legality of a price until it is too late; until the price has or has not in fact resulted in the prohibited consequences. The impossibility of attempting to predict which low price will be illegal because anti-competitive in effect, and which condoned, even encouraged by the antitrust laws, might well restrain the seller from discriminating competitively. A "compete-at-your-own-risk" policy with regard to price differentials implied by a failure to enforce strictly the requirements of the effect language of the statute threatens the Monmouth-Ocean County gasoline market and similar markets within earshot of this court with price uniformity.[16] This is more than conjecture.

There is evidence that where courts have failed to insist upon demonstration of the causative link between discrimination and injury, price uniformity has indeed been the result.[17]

■■ It is the duty of this court to reconcile the administration of the Robinson-Patman Act with the broader central aim of the antitrust laws:[18] to instill and maintain in the business community active competition among its members.[19] Competition, while it may take many forms, is most meaningful and vigorous when it consists of or includes price rivalry. We must read the Act to encourage price competition wherever possible. Price uniformity is the antithesis of competition.

Moreover, the price competition practiced in the market here, though by no means economically ideal, is substantial and beneficial enough to warrant protection. In a market composed of a limited number of distributors selling a standardized product, "catch-as-catch-can" or "secret concession" pricing may be the only kind of effective price competition possible.[20] Indeed the Monmouth-Ocean County gasoline market material to this case is an excellent example of vigorous price competition through "catch-as-catch-can" pricing alone.

Were price uniformity reconcilable with the aims of the Robinson-Patman Act and if the Act sought to strike down

16. "In an oligopolistic industry selling a standarized product any open reduction in list price will be immediately met. Industry recognition that any advantage of a price reduction will be destroyed by competitors' similar actions may lead to an abandonment of all price competition. In such a market, secret price concessions may thus represent the only effective type of price competition and, in the absence of secondary line injury, should not be condemned." Note, 74 Harv.L. Rev. 1597, 1611 (1961).

17. See Edwards, supra footnote 13, at page 485.

18. "[I]t is our duty to reconcile [the interpretations of the Federal Trade Commission] with the broader antitrust policies that have been laid down by Con-

gress." Automatic Canteen Co. of America v. Federal Trade Commission, 346 U.S. 61, 74, 73 S.Ct. 1017, 1024, 97 L.Ed. 1454 (1953).

19. "The general objective of the antitrust laws is promotion of competition in open markets." The Report of the Attorney General's National Committee to Study the Antitrust Laws, March, 1955, at page one.

20. See Note, 74 Harv.L.Rev. 1597, 1611 (1961), supra, footnote 16. Also: "Sporadic, unsystematic discrimination is one of the most powerful forces of competition in modern industrial markets." Adelman, Effective Competition and the Antitrust Laws, 61 Harv.L.Rev. 1289, 1331 (1948), as quoted in Rowe, supra footnote 12, at page 27.

all price discrimination, our construction of the Act with regard to resulting uniformity of prices would be of little moment. But on the contrary, the Act must be read to encourage price competition and advocate price discrimination in the cause of competition wherever it is possible to do so within the bounds of the statute.[21] In the instant case the only competitive effect of sustaining Shore's case without proof of causation would be to render impractical the only meaningful price competition in which Shore, Humble and their rivals are presently engaged. The spirit of the antitrust laws dictates otherwise.

---

We conclude that in the present case it is the practice of all major gasoline distributors in the market to seek contract business, through systems of bidding, at the maximum profitable price at which it can be obtained. This price may be as high as the current posted consumer tank wagon price and may run as low as $.04 less than the tank wagon price, and in rare cases even lower. Humble's complained-of price here was $.036 below the posted consumer tank wagon price and was fixed at a level Humble believed to be the maximum it could profitably charge while obtaining the sought Cab Co. account. The price was independent and not supported by profit margins garnered from other high prices. It was not an unreasonably low price measured against other prices in the industry, including Shore's.

█  Humble, like all other participants in the market, had a discrimina-

tory pricing policy, but from the evidence presented it is clear that discrimination was merely incidental to the injury sustained. The loss of Cab Co. profits by Shore resulted from Humble's offer of a single low price to Cab Co., a self-sufficient price not in turn subsidized by others. Such activity is not prohibited by the Robinson-Patman Act. To deny summary judgment herein, this court would have had to find Shore injured by the relationship between Humble's low price and other prices or by the pricing scheme of Humble, and not by a single low price, in and of itself.

Shore argues that even if the law as we state it is correct, having shown discrimination, injury to competition and damages, the burden of proof then falls on Humble to negate an inference of causation.[22] We have found from all the evidence presented that lack of causation has been established. Hence, even if Humble had the burden of proof on the issue, it has been met.

Were causation present, it would be the duty of this court to inquire into the anti-competitive nature of the injury to Shore, the interstate quality of the sales and discrimination, and the validity of Humble's affirmative defense of "good faith meeting of competition." Since causation has not been established, we make no findings concerning these matters.

On the undisputed facts of this case, plaintiff has no redress under the Robinson-Patman Act for his loss. Defendant's motion for summary judgment is therefore granted.

21. The Robinson-Patman Act does encourage a tendency towards price uniformity to a limited extent in limited areas. Thus, for example, a distributor selling to buyers who compete with each other in the resale of the product, may be required to sell to them at similar prices to protect secondary line competition. But price competition remains a primary goal of antitrust law. Uniform-

ity of price should be an acceptable result of the Act's operation only if: (1) the language of the statute requires it, (2) it is necessary to facilitate competition of some kind elsewhere, and (3) its scope is strictly limited to the need for it.

22. Citing Rowe, supra footnote 12, at page 163.