Donald **DAVIS**, Plaintiff,

v.

**E. I. DuPONT de NEMOURS & COMPANY**, Batten, Barton, Durstine & Osborn, Inc., Columbia Broadcasting System, Inc., Talent Associates, Ltd., David Susskind, Jacqueline Babbin and Audrey Gellen, Defendants.

United States District Court
S. D. New York.
April 16, 1965.

O'Brien, Driscoll & Raftery, New York City, for plaintiff; Paul D. O'Brien, and Milton M. Rosenbloom, New York City, of counsel.

Coudert Brothers, New York City, for defendants; Carleton G. Eldridge, Jr., and Eugene L. Girden, New York City, of counsel.

FEINBERG, District Judge.

Plaintiff Donald Davis claims that a 1960 telecast infringed his copyrights in a dramatization of Edith Wharton's famous novel "Ethan Frome." Plaintiff sues on his own behalf and as executor of the estate of his father Owen Davis, a Pulitzer Prize winning playwright, who collaborated with him on the dramatization. Defendants are E. I. DuPont de Nemours & Company ("DuPont"), sponsor of the allegedly infringing telecast; Batten, Barton, Durstine & Osborn, Inc. ("BBDO"), DuPont's advertising agency; Columbia Broadcasting System, Inc. ("CBS"), the network over which the program was televised; Talent Associates, Ltd. ("Talent"), producer of the telecast; David Susskind ("Susskind"), the Talent officer in charge of the production; and Jacqueline Babbin ("Babbin") and Audrey Gellen ("Gellen"), Talent employees who prepared the script. The case, limited by stipulation to issues of liability, was tried without a jury.

Edith Wharton's novel, "Ethan Frome," is a classic in American literature. The setting of the novel is Starkfield, a small New England town at about the turn of the century. Ethan Frome, a man of twenty-eight, shares an unhappy, impoverished farmhouse with his thirty-five year old shrewish wife, Zenobia (Zeena). Her illnesses, real and imagined, consume the major portion of the meager living Ethan is able to eke out of the land. Mattie Silver, Zeena's young orphaned cousin, comes to live with the Fromes as a servant, bringing youthful

exuberance to their otherwise drab existence. As Mattie's stay lengthens, she and Ethan come to share an unspoken, romantic attachment for each other. Zeena, suspecting this, orders Mattie to leave, ostensibly to replace her with someone who will be a greater help with the housework. Ethan is unable to persuade Zeena to change her mind and he cannot, morally or financially, abandon his unhappy circumstances and run off with Mattie. As he and Mattie are about to be separated forever, they realize that they can never be happy if they are apart. Impulsively, they decide to end their misery by sledding down a steep hill at high speed into a huge elm tree. Ironically, they are denied this ultimate means of escape and become mentally and physically crippled, trapped with Zeena in a poor house of bitter memories.[1]

A dramatization of the novel by Donald and Owen Davis was produced on Broadway with a distinguished cast, including Raymond Massey, Pauline Lord and Ruth Gordon; it opened to critical acclaim on January 21, 1936. It is this dramatization that plaintiff Davis claims was infringed by a television version of "Ethan Frome" in 1960. In response, defendants have hurled a barrage of contentions, discussed below.

## I

Analysis of the issues in this case requires, at the outset, a detailed statement of the copyright history of various versions of "Ethan Frome." The novel was published in book form on September 30, 1911.[2] The publishers, Charles Scribner's Sons ("Scribner"), obtained a copyright on the novel at that time.[3] On June 1, 1934, Lowell Barrington obtained a copyright[4] in a purported dramatization of "Ethan Frome," entitled "The Silent Women" ("the Barrington play").[5]

On December 1, 1934, Edith Wharton, Lowell Barrington, and Owen and Donald Davis entered into a written agreement ("the December 1934 Agreement")[6] whereby the Davises obtained exclusive rights to dramatize the novel.

The December 1934 Agreement stated that the Barrington play was not satisfactory to Mrs. Wharton and provided, among other things, that the Davises were authorized to use any portion of the Barrington play in creating their dramatization, and that the dramatic rights of the novel, the Barrington play, and the dramatization of the Davises:

> "shall become an entity and shall be owned by the parties hereto in the respective portions in which they participate in the earnings * * * and that all contracts to be entered into for the use of said properties shall bear the signatures of the Author's representative and the Messrs. Davis."

The "portions" referred to were fifty percent to Edith Wharton, twenty-five per cent to Barrington, and twenty-five per cent to the Davises. By a supplemental agreement dated October 14, 1935,[7] Barrington's percentage was reduced to twelve and one-half per cent, and Donald Davis's percentage was increased from one-half of twenty-five per cent (twelve and one-half per cent) to twenty-five per cent. The December 1934 Agreement also provided:

> "[T]he copyright shall be taken out in the names of Owen Davis and Donald Davis, who shall execute a deed of trust that they hold it for themselves and the other parties hereto in the respective proportions in which they share in the earnings."

On December 5, 1934, Owen and Donald Davis obtained a copyright as an un-

---

1. This summary omits many of the nuances of Mrs. Wharton's story and, of course, in no way conveys the beauty of her language.

2. Plaintiff's Exhibit (hereinafter cited as "Pl. Ex.") 1.

3. Registered as A 297334.

4. Registered as D unpub. 29502.

5. Defendants' Exhibit (hereinafter cited as "Def. Ex.") F.

6. Pl. Ex. 2.

7. Pl. Ex. 3.

published work on the play written pursuant to the December 1934 Agreement.[8] Edith Wharton, the Davises and Scribner entered into a publishing agreement with respect to the Davis dramatization on December 26, 1935.[9] Scribner published the play in February 1936, and obtained a copyright on April 3, 1936.[10] Both the unpublished and published versions of the Davis dramatization are referred to herein as "the Davis play."

Edith Wharton died on August 12, 1937. Frederic R. King and Leroy King, executors of Mrs. Wharton's estate, renewed the copyright on the novel on September 22, 1939.[11] By written instrument dated February 4, 1942, Scribner conveyed to the executors all of its right, title and interest in the copyright of the novel. On this same date, Scribner conveyed to Owen and Donald Davis all of its right, title and interest in the copyright of the published Davis play. On February 17, 1942, Mrs. Wharton's executors transferred all their right, title and interest in new and renewal copyrights in the novel, together with all rights of any kind owned by them in the novel, all versions and dramatizations thereof, to Elisina Tyler ("Tyler"), residuary legatee under Edith Wharton's will.[12]

On February 19, 1942, Tyler, Barrington, Owen and Donald Davis, Max Gordon, Max Gordon Plays, Inc.[13] and Warner Bros. Pictures, Inc. entered into a contract whereby Warner Bros. obtained the right to create a moving picture based on the novel, the Barrington play, and the Davis play.[14] This contract incorporated the December 1934 Agreement as a part thereof, and also granted Warner Bros. the right to show on television any film made pursuant to its terms. However, it did not grant the right to a televised production using live actors or any other television rights growing out of the properties involved. The consideration paid by Warner Bros. was $17,500, to be distributed fifty per cent to the producers of the play on Broadway and fifty per cent to Tyler, Barrington and the Davises in proportions conforming to the December 1934 Agreement, as amended.

Pursuant to the 1942 contract, Helen Deutsch, an employee of Warner Bros., thereafter completed a screenplay ("the Deutsch screenplay"). Apparently no motion picture was ever produced under this agreement. By mesne conveyances, on and before January 1, 1958, Columbia Pictures Corp. ("Columbia") succeeded to all rights of Warner Bros.[15] Owen Davis died on October 14, 1956, and plaintiff Donald Davis thereafter qualified as an executor.[16]

In 1959, Susskind, at that time executive vice president of Talent, secured approval of BBDO and DuPont to produce "Ethan Frome" on "The DuPont Show of the Month." At or about the same time, Susskind and other Talent employees explored the possibility of obtaining whatever rights might be necessary. On February 2, 1959, a Talent employee sent a telegram to plaintiff Davis asking if live television rights for the Davis "adaptation" of "Ethan Frome" were available for "The DuPont Show of

---

8. Registered as D unpub. 32434. The unpublished version of the play is Pl. Ex. 4.

9. Pl. Ex. 7.

10. Registered as D 42053. The published version of the play is Pl. Ex. 8.

11. Registered as R 78908.

12. The text between footnotes 11 and 12 comes from pre-trial order, para. 3(a) iii, iv, xi.

13. Max Gordon and Max Gordon Plays, Inc. were the producers of the Davis play on Broadway.

14. Pl. Ex. 15.

15. Pre-trial order, para. 3(a) viii.

16. There were some conveyances and reconveyances between Donald Davis and a corporate alter-ego owned by him and his wife. These are immaterial except insofar as they are necessary to the precise chain of title of the copyright in the Davis dramatization.

the Month."[17] Thereafter, negotiations between Talent and Davis broke down because Davis imposed conditions that were unacceptable to Talent.[18] Meanwhile, Talent, for the sum of $15,000, obtained from the beneficiaries of the Tyler estate certain rights to present a television program based upon "Ethan Frome."[19] Plaintiff maintains that the rights obtained did not include the right to use the Davis play, but concedes that a television production based solely on the Edith Wharton novel would have been proper. The question is discussed in greater detail below. Talent also entered into agreements with Columbia, dated August 6, 1959 and February 4, 1960, which purported to grant Talent the right to present a single live television performance of "Ethan Frome," and to use and adapt the Deutsch screenplay in preparation thereof.[20]

In December 1959 and January 1960,[21] Davis formally notified defendants that if they went ahead with the proposed television performance of "Ethan Frome" based upon the Deutsch screenplay, without the consent of Davis, they would be committing a deliberate copyright infringement. Despite this, Talent's version of "Ethan Frome," the allegedly infringing telecast, appeared on television on February 18, 1960 as "The DuPont Show of the Month" over the facilities of defendant CBS's network.[22]

## II

The test for copyright infringement is "whether the one charged with the infringement has made an independent production, or made a substantial and unfair use of the complainant's work." Nutt v. National Institute for Imp. of Memory, 31 F.2d 236 (2d Cir. 1929); accord, Comptone Co. v. Rayex Corp., 251 F.2d 487 (2d Cir. 1958). Initially, a plaintiff must prove copying, for it is settled copyright law that proof of even substantial similarity between a copyrighted work and the allegedly infringing work, does not, by itself, inevitably indicate an unfair use. Alfred Bell & Co. v. Catalda Fine Arts, Inc., 191 F.2d 99, 103 (2d Cir. 1951); Oxford Book Co. v. College Entrance Book Co., 98 F.2d 688, 692 (2d Cir. 1938); Greenbie v. Noble, 151 F.Supp. 45, 68 (S.D.N.Y.1957).

Proof of copying here is complicated by two factors: four different media of expression are involved (the novel, the theater, moving pictures and television), and the claimed copying is primarily secondhand, not direct. Plaintiff seeks to prove that the allegedly infringing television script[23] was copied from the Deutsch screenplay which, in turn, was copied from the Davis play.

Examining the first step, it is virtually uncontroverted that defendants' teleplay was copied from the Deutsch screenplay. Susskind testified that he obtained the Deutsch screenplay from Columbia, along with the right to adapt it for television.[24] Babbin and Gellen testified that they proceeded with the adaptation by writing on the face of the copy of the Deutsch screenplay obtained by Susskind.[25] This altered copy of the Deutsch screenplay is in evidence[26] and

17. Pl. Ex. 14.

18. Transcript (hereinafter cited as "Tr.") pp. 776–77.

19. Def. Ex. A. The written agreement is dated July 6, 1959, but there is testimony that a prior oral agreement had been reached. Tr. p. 783.

20. Pl. Exs. 16, 17.

21. Pl. Exs. 18–20. Defendants Babbin and Gellen were not personally notified, but were made aware of plaintiff's claim.

22. Not more than 20% of the television program was pre-recorded on video tape; the balance was broadcast live. Tr. p. 42.

23. By referring to the infringing "script," the court is not unmindful that the allegedly infringing work is the television show itself. (Def. Ex. H) The script is frequently referred to in this opinion to facilitate discussion.

24. Tr. pp. 61–63.

25. Tr. pp. 94–95, 136–38, 694–95, 790–91.

26. Pl. Ex. 25. Pl. Ex. 26, also in evidence, is a mimeographed copy of the net result of the Babbin-Gellen changes in the Deutsch screenplay.

comparison of it with a later revised script,[27] a transcript of the audio portion of the television show [28] and a kinescope reproduction of the show itself,[29] shows continued use of significant portions of the Deutsch screenplay. I therefore find that defendant Talent, through its employees, did copy the Deutsch movie script.

That Talent copied from the Deutsch screenplay is of only academic interest unless Miss Deutsch copied from the Davis play. Neither party introduced any testimony from Miss Deutsch. There is very little question, however, that Miss Deutsch had access to the Davis play. The 1942 contract which gave Warner Bros. permission to make "Ethan Frome" into a movie acknowledges receipt by Warner Bros. of the Barrington play and the Davis play, with permission to use either of these works and the novel in writing the screenplay.[30] Plaintiff asks the court to infer that what Warner Bros. received was turned over to its writer, Miss Deutsch. The inference is justifiable and I find that Miss Deutsch had access to the Davis play.

■ A comparison of the Davis play with the Deutsch screenplay clearly supports a finding of copying. Limitations of space preclude a listing of all of the many similarities between the two works. However, the following are illustrative.

1. Act I, scene 1 of the Davis play departs from the continuity and events of the Wharton novel. In the Davis play, immediately following a prologue, there is a scene between Ethan Frome and his wife Zeena, which takes place in the Frome farmhouse kitchen. The scene accomplishes many purposes. Among other things, it introduces Zeena, establishes her character and her real or imagined illnesses, and shows the relationship between Ethan and Zeena, their

poverty, and their feelings about the coming of Mattie Silver. The scene also includes the arrival of Mattie and her timid attempt to bring something of her cheerfulness into the bleak farmhouse, and illustrates the effect upon the other characters of her ineffectual, but well-meaning, attempts to be helpful in the house. This scene is based upon material and information in the novel, but it does not exist in the novel. There are only three lines in it from the novel, and the Davises rewrote the scene "a hundred times" before they were satisfied.[31] At the end of this scene, a member of the audience is at approximately the same place in the development of the story as a reader of the novel is at the end of chapter I, yet the means of arriving at this point are, of course, completely different. In the novel, Mrs. Wharton uses the device of having Ethan recall events of the past year—from the time when Mattie came to live with the Fromes. The Davis play, after the prologue, begins from the time of Mattie's arrival.

It is quite clear that the Deutsch screenplay substantially incorporates the bulk of what the Davises did in Act I, scene 1 of their play. I refer here not only to instances of identical language, but also to the structure of the scene, the chain of events, the time and place, the basic dramatic content and the conflict, apparent and incipient, growing out of the personalities of Ethan, Zeena and Mattie. For example, the first line of Act I, scene 1 of the Davis play has Zeena complain to Ethan that she has asked him a dozen times to fix the window in the spare room.[32] In the Deutsch screenplay, the same scene is opened with a similar request by Zeena.[33] In both, Zeena's command immediately sets up a dramatic conflict with Ethan as to why the repair is necessary, and shows Zeena's circuitous approach to letting Ethan know the painful news that Mattie

27. Pl. Ex. 28.

28. Pl. Ex. 24.

29. Def. Ex. H.

30. Pl. Ex. 15.

31. Tr. pp. 201, 205.

32. Pl. Ex. 8, p. 17.

33. Def. Ex. G, p. 18.

Silver is coming.[34] Similarly, there is a reference here in the Deutsch screenplay to Mattie's too fancy dress which Zeena states "looks like it was made out of the porteers." [35] In the Davis play, Zeena says to Mattie: "What's that you got on—a dress? Looks kind of like a pair of 'porteers'." [36] The expression does not occur in the novel.

2. Another significant example of use by Deutsch of the Davis play occurs in "Mrs. Wharton's famous supper scene," [37] which takes place after Zeena has left to see a doctor in a town far enough away to require an overnight stay. Mattie and Ethan are left alone in the farmhouse. In the novel, while the feeling of deep, but unspoken, emotion between the two is strong, very little is said during the course of the evening and very little of an overt dramatic nature happens. To communicate to the audience something of what Ethan feels in the suddenly warm, attractive and festive kitchen, the Davises used the devices of introducing a third person (Jotham, the hired man) and the serving of sweet cider at supper.[38] Jotham's departure makes dramatic the fact that Mattie and Ethan are alone and enjoying the sweetness of being together. In the novel, there is no third person at supper and no cider. In the Deutsch screenplay, Jotham and cider are introduced for the same purpose.[39] In the same scene after Jotham has left, there are similarities of language between the Deutsch screenplay and the Davis play which are not directly found in the novel.[40]

3. Another example of use by Deutsch of the Davis play occurs in the climactic confrontation scene between Zeena and Ethan. At this point, Zeena has pronounced Mattie's doom and announced that Mattie is leaving the next day. In the novel, Ethan pleads with Zeena but does not argue with her at length, retires to a little room and composes a letter which he intends to send her but never does.[41] In the Davis play, there is a strong scene in which seven years of resentment over living with Zeena boils out of Ethan and he tells her he wants to make a fresh start in the West with Mattie. Zeena coldly and shrewdly obstructs him and uses her knowledge of his moral character to convince Ethan that he cannot, in his poverty, escape his obligations to her. The structure of the scene, the development of the passionate argument and much of the language is carried over from the Davis play into the Deutsch screenplay.[42]

As indicated above, the examples just discussed at length by no means exhaust the numerous similarities between the Davis play and the Deutsch screenplay.[43] It is true that the screenplay does differ from the Davis play by the addition of several scenes and emphasis on the romantic side of Mrs. Wharton's novel. Other changes can be traced to the difference in media. However, but for these differences, the works are quite similar. The similarities, along with the evidence of access, justify a finding that Deutsch copied from the Davis play and incorporated substantial portions of it in her work.[44] This finding is based on

34. Tr. p. 203.

35. Def. Ex. G, p. 31.

36. Pl. Ex. 8, p. 39.

37. Tr. p. 208.

38. Pl. Ex. 8, pp. 138–54.

39. Def. Ex. G, pp. 98–101.

40. E.g., Def. Ex. G, p. 103; Pl. Ex. 8, pp. 159–60. Compare Def. Ex. G, pp. 101–07 *passim*, with Pl. Ex. 8, pp. 155–76 *passim*.

41. Pl. Ex. 1, pp. 132–34.

42. Pl. Ex. 8, pp. 220–26; Def. Ex. G, pp. 131–34.

43. It is interesting, for example, to note that while Mrs. Wharton says that Zeena is thirty-five years old (Pl. Ex. 1, p. 64), Davis lists her age at thirty-two (Pl. Ex. 8, p. 17), while Deutsch similarly has her "in her early thirties" (Def. Ex. G, p. 17).

44. Since Miss Deutsch had permission to use the Davis play, there is no implication that her extensive use of it was in any way improper.

my own reading and comparison of both works.[45]

As indicated above, the bulk of the Deutsch screenplay found its way into the telecast, and this included the significant portions of the Davis play used by Deutsch. Each of the scenes and similarities between Deutsch and Davis discussed above in detail were used in the telecast,[46] as were other portions of the Davis play. Accordingly, I find that the 1960 telecast was copied from the Davis play.[47]

Defendants further contend that even if they copied the Davis play through the Deutsch screenplay, they did not make substantial use of the Davis play in the actual television program. After Misses Babbin and Gellen had completed their adaptation from the Deutsch screenplay, they were informed of the existence of the Davis play and the possible infringement liability. They then proceeded to do what in defendants' opinion was necessary to "unDavis" the T.V. script.[48]

Defendants urge the court to remember, in ruling on whether they were successful in this endeavor, that they had contractual rights to use the novel and the Deutsch screenplay. They argue that "anything in the Deutsch scenario which can be found in or attributed to the Wharton novel, that is the independent creation of Deutsch, or which are merely elements which are inherent in the par-

ticular theme, environment, background or setting of 'ETHAN FROME' were fairly at the disposal of defendant Talent." [49]

Defendants have too broadly defined their rights. An analogy may properly be drawn to cases in which the copyrighted work is an original expression of ideas, or themes, objects or information in the public domain. One who, without permission, copies and makes substantial use of such an original work can hardly escape liability as an infringer by asserting his right to appropriate the underlying ideas or public domain aspects of the copyrighted work. Toksvig v. Bruce Pub. Co., 181 F.2d 664 (7th Cir. 1950); cf. Caldwell-Clements, Inc. v. Cowan Publishing Corp., 130 F. Supp. 326 (S.D.N.Y.1955). The law in such cases protects the copyright holder's original expression of the ideas or public domain components of his work. E. g., Mazer v. Stein, 347 U.S. 201, 217, 74 S.Ct. 460, 98 L.Ed. 630 (1954); Prestige Floral, S. A. v. California Artificial Flower Co., 201 F.Supp. 287 (S.D. N.Y.1962); see Axelbank v. Rony, 277 F.2d 314, 317 (9th Cir. 1960). Indeed, once copying is established, it is immaterial that a defendant could have created a similar or identical work using elements fairly at his disposal. Alfred Bell & Co. v. Catalda Fine Arts, Inc., 191 F.2d 99, 105 (2d Cir. 1951); Alva Stu-

---

45. Although the Deutsch screenplay is not the allegedly infringing work, nevertheless, it is significant to determine whether she copied from Davis. In comparing both of these works, I have deemed myself bound by the standards which would govern my examination if the issue before me were Miss Deutsch's liability, and she had denied copying. A finding of copying may properly rest on circumstantial evidence of access plus similarities between both works (see Arnstein v. Porter, 154 F.2d 464 (2d Cir. 1946)), which in this case is both convincing and striking.

46. As to item 1, see Pl. Ex. 24, pp. 5–13; as to item 2, see Pl. Ex. 24, pp. 45–48; as to item 3, see Pl. Ex. 24, pp. 60–63.

47. Although not necessary to this finding, there is evidence that in addition to the

indirect copying of Davis via Deutsch, a portion of the epilogue in the telecast may have been copied directly from the Dramatists Play Service edition of the Davis play. At a time when defendants Gellen and Babbin had already gone through the Dramatists Play Service edition in an effort to delete possibly infringing passages, Miss Gellen made changes in the epilogue at the insistence of Julie Harris (who glowingly portrayed Mattie Silver in the telecast). Tr. pp. 770–71. As a result, the epilogue in the television play more closely resembled the Davis play than the Deutsch screenplay.

48. Tr. p. 733.

49. Defendants' Trial Memorandum p. 14.

dios, Inc. v. Winninger, 177 F.Supp. 265, 268 (S.D.N.Y.1959); cf. Caldwell-Clements, Inc. v. Cowan Publishing Corp., supra; see Sheldon v. Metro-Goldwyn Pictures Corp., 81 F.2d 49, 53–54 (2d Cir.), cert. denied, 298 U.S. 669, 56 S.Ct. 835, 80 L.Ed. 1392 (1936). Logically, the rule ought not to be different where, as here, the foundation of both works lies not in the public domain, but in a prior copyrighted work. Cf. Harper & Bros. v. Kalem Co., 169 Fed. 61 (2d Cir. 1909), aff'd 222 U.S. 55, 32 S.Ct. 20, 56 L.Ed. 92 (1911).

Plaintiff's contentions are consistent with this analysis. He does not question Talent's right to adapt Mrs. Wharton's novel for television;[50] he does assert that Talent had no right to copy his dramatization of the novel. Therefore, since copying has already been proved, Talent's independent rights to use the novel cease to have significance. The only further relevant inquiry is whether the television show incorporated enough of the Davis original manner of expression to constitute an infringing use.

I have compared the Davis play with the kinescope of the television show, as well as with the transcribed audio portion of the broadcast.[51] Despite several additions,[52] the overall impression is that, in the majority of instances in which the television show dramatized something that Davis had dramatized, it did so in the Davis manner. The labors of Misses Babbin and Gellen to take Davis out of the television show after being asked to do so were too little, too late and too transparent.[53] In almost every instance, their "changes" amounted to mere paraphrasing, inversion of dialogue, or substitution of one insignificant object for another.[54] But paraphrasing is tantamount to copying in copyright law.[55] Defendants did not successfully remove the original, protectible features of the Davis play from the television script, and

50. Presumably, plaintiff would also concede that Talent had the right to use any of Deutsch's independent creations.

51. In making this and other comparisons referred to in this opinion, I have placed most reliance on my impressions as an average observer, rather than on dissections offered by experts. Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274 F.2d 487, 489 (2d Cir. 1960); Funkhouser v. Loew's, Inc., 208 F.2d 185, 188 (8th Cir. 1953), cert. denied, 348 U.S. 843, 75 S.Ct. 64, 99 L.Ed. 664 (1954); Nichols v. Universal Pictures Corp., 45 F.2d 119, 123 (2d Cir. 1930), cert. denied, 282 U.S. 902, 51 S.Ct. 216, 75 L. Ed. 795 (1931).

52. The presence of original elements in the infringing work, even though they quantitatively exceed the copied matter, does not relieve the infringer of liability. Orgel v. Clark Boardman Co., 301 F.2d 119 (2d Cir.), cert. denied, 371 U.S. 817, 83 S.Ct. 31, 9 L.Ed.2d 58 (1962); National Comics Publications, Inc. v. Fawcett Publications, Inc., 191 F.2d 594, 603 (2d Cir. 1951), modified on other grounds, 198 F.2d 927 (2d Cir. 1952); Universal Pictures Co. v. Harold Lloyd Corp., 162 F.2d 354, 360–361 (9th Cir. 1947).

53. No indication of personal bad faith on their part is intended. Presumably, the rigors of a television production schedule afforded them little practical opportunity to make any major changes in the television script. Moreover, it is settled that good faith will not avoid liability if plaintiff proves his case. Sheldon v. Metro-Goldwyn Pictures Corp., 81 F.2d 49, 54 (2d Cir.), cert. denied, 298 U.S. 669, 56 S.Ct. 835, 80 L.Ed. 1392 (1936); see Buck v. Jewell-La Salle Realty Co., 283 U.S. 191, 51 S.Ct. 410, 75 L.Ed. 971 (1931).

54. E. g., the reference to Mattie's dress as being made out of "the porteers," which appeared in the Davis play and the Deutsch screenplay (see notes 35–36 supra and accompanying text), originally appeared in the television script (Pl. Ex. 25, p. 25) but was changed to "looks like it was made up for a fancy woman." Pl. Ex. 24, p. 13; Pl. Ex. 28, p. 28.

55. Nutt v. National Institute for Imp. of Memory, 31 F.2d 236 (2d Cir. 1929); Addison-Wesly Publishing Co. v. Brown, 223 F.Supp. 219, 227–228 (E.D.N.Y. 1963); see Warner Bros. Pictures, Inc. v. Columbia Broadcasting System, Inc., 216 F.2d 945, 950 (9th Cir. 1954), cert. denied, 348 U.S. 971, 75 S.Ct. 532, 99 L. Ed. 756 (1955).

defendants are therefore liable for copyright infringement.

Defendants attack the key findings that Miss Deutsch had access to the Davis play and copied from it. In doing so, they rely heavily on the Barrington script. Defendants point out that the same contract that provided Warner Bros. with the Davis play also furnished it with the Barrington play, and that the inference that Miss Deutsch copied from Barrington, rather than from Davis, is equally justifiable. Plaintiff responds that Miss Deutsch would logically choose to copy from the dramatization that met with acclaim [56]—the Davis play—rather than the one which had been unacceptable both to Mrs. Wharton and a noted theatrical producer [57]—the Barrington play. Defendants also argue that the Barrington play is so similar to the Davis play that it cannot be inferred with reasonable certainty that Miss Deutsch copied from one rather than the other. Indeed, it is defendants' contention that the Davis and Barrington plays are so similar that plaintiff himself must have copied from Barrington or have been strongly influenced by him. The answer to all of defendants' contentions as to Barrington is that one cannot read and compare the Barrington and Davis plays,

as I have done, without concluding that they are in all meaningful respects utterly different.[58] Barrington was content merely to convert Ethan Frome's ruminations into dialogue—to have him think out loud—presumably the most elementary way of dramatizing a novel of this type. Davis, however, transfers Ethan's meaningful thoughts into dramatic moments. For example, in the confrontation scene, Barrington has Ethan read out loud to himself the letter to Zeena which Ethan, in the novel, starts to compose and then pushes aside.[59] Davis transforms these elements of Ethan's thoughts into dialogue between Ethan and Zeena [60] and thus creates one of the climactic moments of the play. The Davis play, except insofar as it is a dramatization of someone else's story, is an original work. I specifically reject the contentions that Davis copied from Barrington [61] and that Deutsch did not copy from Davis.

■ This finding also sets at rest defendants' contention (raised obliquely at best in the pre-trial papers but asserted forcefully at trial) that the Davis play lacked the requisite originality to be validly copyrighted. This argument is wholly without merit here in view of the very minimal standards of originality

56. Perhaps the highest praise for the Davis play came from Edith Wharton herself who, in a foreward to the published version of the play (Pl. Ex. 8, p. viii), stated:

"I imagine few [novelists] have had the luck to see the characters they had imagined in fiction transported to the stage without loss or alteration of any sort, without even that grimacing enlargement of gesture and language supposed to be necessary to 'carry' over the footlights.

"I should like to record here my appreciation of this unusual achievement, and my professional admiration for the great skill and exquisite sensitiveness with which my interpreters have executed their task."

57. Pl. Ex. 2; Tr. p. 394.

58. There are isolated instances of similarities which were brought out in cross-examination of plaintiff, which plaintiff

characterized at one point as "fantastic." Tr. pp. 268–364, 375–433 *passim*. However, most of the examples of similar dialogue brought out in cross-examination are expressions and sentences used by Mrs. Wharton. Plaintiff's credibility is called into issue in some of these instances in which lines claimed to be his own creation are actually attributable to the novel. But only his memory, not his veracity, is doubtful. Certainly it would have helped his cause to say that the lines were from the novel if, in fact, he knew that they were, because this would have helped to negate defendants' claim that he copied from Barrington.

59. Def. Ex. F, p. 132; Pl. Ex. 1, pp. 132–34.

60. Pl. Ex. 8, pp. 222–26.

61. Davis steadfastly denied ever having read the Barrington play, let alone having copied from it. Tr. pp. 253, 272, 433.

established by the courts.[62] It cannot be doubted that there may be several different dramatizations of the same work, each capable of being copyrighted.[63]

### III

Defendants contend that plaintiff's copyright is invalid because the published version of his play does not contain a proper copyright notice. Under 17 U.S. C. § 19, "the notice of copyright * * * if the work be a * * * dramatic work * * * shall include * * * the year in which the copyright was secured by publication. * * *" The notice of copyright in the published version of the Davis play was as follows:

"Copyright, 1911, 1922, 1936, by CHARLES SCRIBNER'S SONS

Copyright, 1935, By Owen and Donald Davis"

The Davis play was registered for copyright on December 5, 1934, as an unpublished work. Scribner published the play in February 1936. Defendants argue that under 17 U.S.C. § 19, reference to 1935, instead of 1934, makes the notice improper and thus invalidates the copyright.

Defendants' contention rests on the assumption that, when an unpublished work is involved, "the year in which the copyright was secured by publication" must be construed to mean the year in which a copyright on an unpublished work is secured by depositing a copy in the copyright office in compliance with 17 U.S.C. § 12.[64] The argument can be supported by decisions which have equated deposit of an unpublished work to publication of a published work when necessary to sustain the constitutionality of other copyright provisions or to effectuate obvious legislative intent.[65]

The error here was one of twenty-seven days, since the registration of the unpublished work fell short of occurring in 1935 only by that small period. Assuming that the copyright notice of the Davis play as published ought to have contained the year in which his unpublished work was deposited, the question remains whether the notice in this case containing the following year automatically invalidates the copyright. Stated broadly, the issue is whether substantial, good faith compliance with the requirements of section 19 will suffice in absence of any indication that someone relied to his detriment on the imperfect notice.

Strict construction of the requirement that the year of publication be stated has been commonly regarded as stemming from an 1848 case, Baker v. Taylor.[66] In that case, the year mentioned in the notice of copyright was 1847 instead of 1846, the year of actual publication. Although the court stated that unintentional error would invalidate the copyright, there was more than a mistake in Baker v. Taylor, because plaintiffs there knew of the error before publication and did not trouble to correct it. In recent times,

62. See, e. g., Wihtol v. Wells, 231 F.2d 550 (7th Cir. 1956); Alfred Bell & Co. v. Catalda Fine Arts, Inc., 191 F.2d 99, 102–103 (2d Cir. 1951).

63. Harper & Bros. v. Kalem Co., 169 Fed. 61, 63 (2d Cir. 1909), aff'd, 222 U.S. 55, 32 S.Ct. 20, 56 L.Ed. 92 (1911); G. Ricordi & Co. v. Paramount Pictures, Inc., 92 F.Supp. 537, 541 (S.D.N.Y. 1950), modified on other grounds, 189 F. 2d 469 (2d Cir.), cert. denied, 342 U.S. 849, 72 S.Ct. 77, 96 L.Ed. 641 (1951).

64. "Copyright may also be had of the works of an author, of which copies are not reproduced for sale, by the deposit, with claim of copyright, of one complete copy of such work * * *."

65. E.g., Shilkret v. Musicraft Records, Inc., 131 F.2d 929 (2d Cir. 1942), cert. denied, 319 U.S. 742, 63 S.Ct. 1030, 87 L.Ed. 1699 (1943); Marx v. United States, 96 F.2d 204 (9th Cir. 1938).

66. Baker v. Taylor, 2 Fed.Cas. p. 478 (No. 782) (C.C.S.D.N.Y.1848). See, e. g., Howell, Copyright Law 76 (Latman Rev. ed. 1962); Nimmer, Copyright § 85.3 (1964); Doyle, Cary, McCannon & Ringer, Notice of Copyright, in Subcomm. on Patents, Trademarks, and Copyrights of the Senate Comm. on the Judiciary, 86th Cong., 2d Sess. 5, 21 (Comm. Print, Copyright Law Revision Study No. 7, 1960) (hereinafter cited as "Doyle et al.").

the rule illustrated by Baker v. Taylor—that the copyright notice must accurately reflect all required information—has been the basis of many lower court rulings invalidating copyrights in which the notice insufficiently identified the copyright proprietor.[67] Moreover, opinions have continued to indicate that the law is that a notice containing a year later than the actual date of copyright invalidates the copyright, although such statements do not appear to be holdings.[68] On the other hand, there are a number of decisions holding harmless the error of using in the notice a year earlier than the actual copyright date.[69] The basis for disregarding this discrepancy is that the error is in favor of the public; since the period of duration of the copyright is deemed to commence with the notice date, the copyright period is diminished by the error.

A liberal attitude has been evident in recent cases dealing with dating errors in the application for a certificate of copyright. In Advisers, Inc. v. Wiesen-Hart, Inc., 238 F.2d 706 (6th Cir. 1956), cert. denied, 353 U.S. 949, 77 S.Ct. 861, 1 L.Ed.2d 858 (1957), the date of publication for a book alleged in the certificate of registration was December 9, 1953. However, the actual date of publication was in August 1953. In an action for copyright infringement, defendant urged that the copyright was invalid because the publication date contained in the registration certificate was an attempt to extend the copyright protection for longer than the statutory period. However, the Court of Appeals for the Sixth Circuit reversed summary judgment for defendant, answering this contention as follows (238 F.2d at 707, 708):

> "It is to be noted that the statutory protection of a copyright extends for a period of twenty-eight years, and thereafter can be renewed for a further period of twenty-eight years. It would seem that, in view of copyright protection for fifty-six years, a period of four or five months would be an immaterial variance without consequence to the public, unless there were some intention to secure an advantage in violation of the statute, or with a fraudulent purpose.

> \*   \*   \*   \*   \*   \*

> "The statute grants valuable rights to persons who create such matter which is copyrightable; and the later cases, in the courts of appeals and in the district courts, emphasize, implicitly, perhaps, on the ground of the subsequent revision of the copyright laws, that useless technicalities are not to be allowed to cut down the benefits conferred.

> \*   \*   \*   \*   \*   \*

> "It is our conclusion \* \* \* that an innocent misstatement, or a cleri-

---

67. Carter v. Hawaii Transp. Co., 201 F. Supp. 301, 305 (D.Hawaii 1961); Klasmer v. Baltimore Football, Inc., 200 F.Supp. 255 (D.Md.1961); Moger v. WHDH, Inc., 194 F.Supp. 605 (D.Mass. 1961); Metro Associated Serv., Inc. v. Webster City Graphic, Inc., 117 F.Supp. 224, 232–233 (N.D.Iowa 1953); Group Publishers, Inc. v. Winchell, 86 F.Supp. 573 (S.D.N.Y.1949).

68. E.g., Heim v. Universal Pictures Co., 154 F.2d 480, 490 (2d Cir. 1946) (Clark, J., concurring "with some hesitation"); American Code Co. v. Bensinger, 282 Fed. 829, 836 (2d Cir. 1922) (dictum; notice antedated actual copyright date); Wrench v. Universal Pictures Co., 104 F.Supp. 374, 378 (S.D.N.Y.1952) (dictum; work in question was "new work");

Basevi v. Edward O'Toole Co., 26 F.Supp. 41, 48 (S.D.N.Y.1939) (dictum); West Publishing Co. v. Edward Thompson Co., 169 Fed. 833, 879 (C.C.E.D.N.Y.1909) (apparently one of several bases for holding equitable relief improper), modified on ground that "new work" involved for which proper copyright notice was given, 176 Fed. 833 (2d Cir. 1910). See also Mifflin v. R. H. White Co., 190 U.S. 260, 264, 23 S.Ct. 769, 47 L.Ed. 1040 (1902).

69. Callaghan v. Myers, 128 U.S. 617, 657, 9 S.Ct. 177, 32 L.Ed. 547 (1888); Shapiro, Bernstein & Co. v. Jerry Vogel Music Co., 161 F.2d 406 (2d Cir. 1946), cert. denied, 331 U.S. 820, 67 S.Ct. 1310, 91 L.Ed. 1837 (1947); American Code Co. v. Bensinger, supra note 68.

cal error, in the affidavit and certificate of registration, unaccompanied by fraud or intent to extend the statutory period of copyright protection, does not invalidate the copyright, nor is it thereby rendered incapable of supporting an infringement action."

In support of its conclusion, the court relied, *inter alia,* upon United States v. Backer, 134 F.2d 533 (2d Cir. 1943). Backer had been convicted of willfully infringing a copyrighted figurine. One of his defenses was that the copyright was invalid because the applications for registration were filed before there was any publication of the figurines. He argued that since the term of a copyright begins to run from the publication date, an application filed before publication cannot result in a valid registration. On appeal from conviction, the court of appeals conceded that there might have been a seven day mistake as to the date of publication, the effect of which would have been "to extend the initial copyright period of twenty-eight years as computed from the certificate for some seven days beyond the date when it would actually expire." 134 F.2d at 536. Despite this, the court held the copyright duly registered because defendant had not been prejudiced. Significantly, the court of appeals in Heim v. Universal Pictures Co., Inc., 154 F.2d 480, 487 n. 7 (2d Cir. 1946), gratuitously raised the issue whether, in light of *Backer* and other authorities,[70] the view expressed in Baker v. Taylor continues to apply. See also Nom Music, Inc. v. Kaslin, 224 F.Supp. 922, 925 (S.D.N.Y.1964), aff'd on other grounds, 348 F.2d 198 (2d Cir. 1965); Ziegelheim v. Flohr, 119 F.Supp. 324 (E.D.N.Y.1954) (discrepancy from

"early in 1943" to December 20, 1943 in statement as to publication date on application for copyright did not effect validity of copyright).[71]

Recent decisions in this circuit have generally reflected the view that "the purpose of a copyright notice is to prevent innocent persons who are unaware of the existence of the copyright from incurring the penalties of infringers by making use of the copyrighted work." Shapiro, Bernstein & Co. v. Jerry Vogel Music Co., 161 F.2d 406, 409 (2d Cir. 1946), cert. denied, 331 U.S. 820, 67 S.Ct. 1310, 91 L.Ed. 1837 (1947); see National Comics Publications, Inc. v. Fawcett Publications, Inc., 191 F.2d 594, 602 (2d Cir. 1951), opinion clarified, 198 F.2d 927 (2d Cir. 1952); Fleischer Studios, Inc. v. Ralph A. Freundlich, Inc., 73 F.2d 276 (2d Cir. 1934), cert. denied, 294 U.S. 717, 55 S.Ct. 516, 79 L.Ed. 1250 (1935). Under this guideline, the courts have been liberal in overlooking defects in the copyright notice when it is obvious that the proprietor has substantially, and in good faith, complied with the statutory requirements, and the defendant has not relied to his prejudice on the notice as it appears on the copyrighted work. B & B Auto Supply, Inc. v. Plesser, 205 F.Supp. 36 (S.D.N.Y. 1962); Trifari, Krussman & Fishel, Inc. v. B. Steinberg-Kaslo Co., 144 F.Supp. 577 (S.D.N.Y.1956); see Prestige Floral, S. A. v. California Artificial Flower Co., 201 F.Supp. 287, 292 (S.D.N.Y.1962). In addition, the Copyright Office regulations have reflected a similar relaxing of requirements. Reversing an earlier position that a variance in the notice date was fatal, the Office has recently expressed the opinion that "if the copyright

---

**70.** Citing Washingtonian Publishing Co. v. Pearson, 306 U.S. 30, 59 S.Ct. 397, 83 L.Ed. 470 (1939); Shafter, Musical Copyright 130–31 (2d ed. 1939).

**71.** See Doyle et al., supra note 66 at n. 119 and accompanying text, stating that the Wiesen-Hart and Ziegelheim opinions "may reflect the more liberal attitude of the courts in this area" and

that although Baker v. Taylor has generally been accepted as representing the law on the point "there may be situations, especially where publication occurred very near the end of the year, in which the equities might lead a court to uphold the validity of a notice with the date of the next year," precisely the issue in this case.

was actually secured not more than one year earlier than the year date in the notice, registration may be considered as a doubtful case." 37 C.F.R. 202.2(b) (1960).

■ Consistent with the liberal philosophy in recent cases in this circuit and in others, I hold that on the facts of this case, in the absence of any suggestion of prejudicial reliance, the variance of twenty-seven days between the copyright date (December 5, 1934) and the notice date (1935) does not invalidate plaintiff's copyright. There is no indication that plaintiff or his publisher used the later date to attempt to extend unlawfully the initial period of copyright. On the contrary, the certificate of registration of renewal copyright [72] bears December 5, 1934 as the initial copyright date. Rather, this was an unintentional variance so slight that I do not believe it should be the reason for withdrawing benefits conferred by Congress.

Plaintiff has advanced an alternative ground for sustaining the copyright despite the error in the notice, based on the decisions in Wrench v. Universal Pictures Co., 104 F.Supp. 374 (S.D.N.Y.1952) and Harris v. Miller, 50 U.S.P.Q. 306 (S.D.N.Y.1941). Briefly, he argues that since the differences in the 1934 unpublished and the 1936 published versions of the play qualify the latter as a "new work," the inclusion of 1935 in the copyright notice was mere surplusage and has no legal effect. It is true that the unpublished and published versions of the play differ, chiefly in the prologue, the epilogue and the end of the supper scene.[73] However, in view of the previous discussion upholding the copyright notwithstanding the inclusion of 1935 in the notice, it is not necessary to deal with this argument.[74]

## IV

Defendants have a number of other arguments growing out of the involved copyright history of the Davis play (see Part I supra). First, defendants argue that plaintiff's failure to obtain a written assignment of the renewal rights to the novel from Mrs. Wharton's heirs removed copyright protection from his play. But the rules of law relied on by defendants to support this claim are inapplicable to the facts in this case.

■ It is settled that an author's renewal right to his copyrighted work is a mere expectancy and that an assignee of the copyright and the renewal rights retains no interest beyond the initial period of copyright if the author is not alive at the beginning of the renewal period —i. e., the last year of the initial copyright term. Miller Music Corp. v. Charles N. Daniels, Inc., 362 U.S. 373, 80 S.Ct. 792, 4 L.Ed.2d 804 (1960); Rose v. Bourne, Inc., 279 F.2d 79 (2d Cir.), cert. denied, 364 U.S. 880, 81 S.Ct. 170, 5 L.Ed.2d 103 (1960). Thus, if Davis were contending that defendants infringed his ownership interest, if any, in the copyright of Mrs. Wharton's novel, defendants would prevail on their showing that Mrs. Wharton had died before the renewal period. Miller Music Corp. v. Charles N. Daniels, Inc., supra. Plaintiff's rights, however, do not depend on any ownership interest in the novel, nor does he claim any such interest in either the original or renewal novel copyrights. Under the terms of the December 1934 Agreement, plaintiff and his father acquired the right to create a play based on the novel—in the words of the Agreement "the sole and exclusive right to dramatize for use upon the spoken stage." Pursuant to the Agreement, the Davises dramatized the novel and created the play "Ethan Frome," which is the work infringed by defendants.[75] This play was

---

72. Pl. Ex. 6.

73. Tr. pp. 247, 357–58.

74. Plaintiff also argues that Scribner had no authority to publish his play with an erroneous notice and cites Modern Aids,

Inc. v. R. H. Macy & Co., 264 F.2d 93 (2d Cir. 1959) for the view that this error should not invalidate the copyright.

75. The play was completed and copyrighted during the initial period of copyright on the novel, which expired in 1939.

copyrightable as a "new work" under 17 U.S.C. § 7, and the copyright on its exists and protects all new matter therein contained, independently of the ownership of the original or renewal copyrights on the novel upon which it is based.[76] G. Ricordi & Co. v. Paramount Pictures, Inc., 189 F.2d 469 (2d Cir.), cert. denied, 342 U.S. 849, 72 S.Ct. 77, 96 L.Ed. 641 (1951); Shapiro, Bernstein & Co. v. Jerry Vogel Music Co., 115 F.Supp. 754, 757 (S.D.N.Y.1953), rev'd on other grounds, 221 F.2d 569 (2d Cir.), modified on rehearing, 223 F.2d 252 (2d Cir. 1955). The significant new matter protected by the Davis play is the original Davis manner of expressing the story of Ethan Frome in the form of a dramatization, and as I have previously found, it is this manner of expression which defendants have infringed.[77]

Defendants also urge that even if the Davis play is validly copyrighted, defendant Talent, as a licensee or transferee from an equitable co-owner of the Davis copyright, had the right to use the play. Under the December 1934 Agreement, "the dramatic rights of the novel 'ETHAN FROME' * * * and the dramatization of the Messrs. Davis" became "an entity" owned by all of the parties to the Agreement in their respective percentages.[78] Also, the copyright on the Davis play was to be taken out in the names of the Davises who were to execute a deed of trust "that they hold it for themselves and the other parties hereto" in the respective ownership percentages.[79] From this, in the absence of any proof that this deed of trust was actually executed, defendants ask the court to impose a constructive trust under which Mrs. Wharton's successors own an equitable interest in an entity composed of the dramatic rights in the novel and the Davis play.[80] In addition, they contend that this equitable interest was actually and validly transferred or licensed by Mrs. Wharton's successors to Talent by a written agreement dated July 6, 1959 ("the Tyler Agreement")[81] and that Talent, as a transferee or licensee from a co-owner, had the right to exploit the copyright without suffering infringement liability.

Defendants' argument raises the interesting question of the power of one who is not a "joint author," but is nevertheless an equitable owner of a copyright, to license the work and thereby confer infringement immunity on his licensee. I do not, however, reach the legal issue posed;[82] after carefully reviewing the

76. The ruling also disposes of defendants' contentions that plaintiff has "unclean hands" on the theory that the Davis dramatization, in the absence of a renewal license, is in itself an infringement of Mrs. Wharton's novel.

77. For this same reason, it is not significant that Talent obtained exclusive television rights to the novel "Ethan Frome" under an agreement between it and Mrs. Wharton's successors in interest. Plaintiff does not argue that Talent could not use the novel.

78. Pl. Ex. 2, para. 7.

79. Id. para. 9.

80. Defendants do not contend that Mrs. Wharton has an interest in the Davis play as a "joint author" under the standard set forth in Shapiro, Bernstein & Co. v. Jerry Vogel Music Co., 221 F.2d 569 (2d Cir.), modified on rehearing, 223 F. 2d 252 (2d Cir. 1955).

81. Def. Ex. A; see note 19 supra and accompanying text.

82. Nor do I reach plaintiff's answering contention that under the December 1934 Agreement, a purported conveyance of "the entity" could not succeed without the written participation of Mrs. Wharton's representative and the Davises. I did, however, consider the effect of this provision on plaintiff's right to seek damages for infringement in view of indications that he had used the Davis play for a television broadcast and authorized a Dramatists Play Service edition of the Broadway play, without obtaining written permission from Mrs. Wharton's representative. As a matter of discretion, I do not believe that these two factors deprive plaintiff of the "clean hands" assertedly required to maintain an infringement action. Davis received no royalty payment from the television show. Tr. p. 265. Mrs. Wharton's successors have

relevant contracts and testimony, I find that under the Tyler Agreement,[83] Mrs. Wharton's successors did not transfer or license their equitable interest, if any, in the Davis dramatization to Talent.

The Tyler Agreement was a "grant [of] the exclusive television broadcasting rights in the work," defined in paragraph 1 as " 'Ethan Frome' * * written by Edith Wharton." The Tyler Agreement does not refer to the Davis dramatization and no serious contention can be made that it was specifically included. Therefore, in order to prove that rights to the Davis dramatization were transferred by the Tyler Agreement, defendants must prove that the Tyler Agreement transferred another part of what the December 1934 Agreement characterized as "an entity"—in this case "the dramatic rights of the novel 'ETHAN FROME'." In other words, defendants must prove that the phrase "dramatic rights" as used in the December 1934 Agreement was intended to include television rights.

The December 1934 Agreement does not define dramatic rights. Significantly, however, that agreement in several places refers to "dramatic rights" and "motion picture rights" in the same sentence.[84] Therefore, it is reasonable to assume that whatever the phrase "dramatic rights" meant, it did not include motion picture rights and meant something less than presentations of the story of Ethan Frome in every non-printed medium. Since the parties did not include motion picture rights in the term "dramatic rights," I do not believe that they intended to include television rights, if they in fact considered them at all.

It is of some significance that the parties to the Tyler Agreement (including Mrs. Wharton's successors who enjoyed Mrs. Wharton's rights under the December 1934 Agreement) did not think, immediately after the Tyler Agreement was signed, that the combination of the December 1934 Agreement and the Tyler Agreement resulted in the transfer of rights to the Davis play. The Tyler Agreement does not contain Davis's signature, although under the December 1934 Agreement, his signature and that of his father were necessary on a contract to use any part of "the entity" referred to therein. Nor does the record show that Barrington or Davis received portions of the proceeds which would be due them under the December 1934 Agreement if "the entity" had been transferred. Moreover, a literary agent representing owners of the novel informed Talent that the Davis play existed,[85] indicating a belief that rights to the Davis play did not go along with television rights to the novel.

Defendant Susskind's testimony indicates clearly that he did not bargain for any rights to the Davis play under the Tyler Agreement. Quite to the contrary, Susskind and his "rights-man" believed it necessary to negotiate with plaintiff's agent for rights to the Davis play; actual negotiations were unsuccessful.[86] Moreover, Talent's later effort to expunge the Davis dramatization from the television script, when notified of the impending infringement, is utterly inconsistent with any belief that they bargained for and received rights to the Davis play under the Tyler Agreement. I find that Talent received no rights whatsoever to the Davis play from Mrs. Wharton's successors.

shared in the royalties on the Dramatists Play Service edition (Pl. Ex. 30); in view of this implied acquiescence to the publication, I cannot say that Davis's failure to procure their written consent amounted to inequitable conduct.

83. Both sides referred to Def. Ex. A, the Tyler Agreement, as a contract or agreement. It was accepted as such in evidence, and apparently was fully performed.

formed. The court will treat it as a contract for these reasons, even though according to its terms, Talent's written acceptance was required, and none appears on Exhibit A.

84. The agreement also refers to "stock, amateur and repertoire rights."

85. Tr. p. 71.

86. Tr. pp. 775–77.

Defendants also contend [87] that the published version of the Davis play is in the public domain because (1) Scribner was a mere licensee and therefore, under 17 U.S.C. § 9, could not obtain a copyright (D-42053) in its own name on April 3, 1936, or, alternatively, (2) Scribner was an assignee and there has been a violation of the requirement of 17 U.S.C. § 32 that "an assignment of the copyright in a specified * * * work" must be recorded before "the assignee may substitute his name for that of the assignor" in the copyright notice. See Group Publishers, Inc. v. Winchell, 86 F.Supp. 573 (S.D.N.Y.1949).

Examination of the 1935 publishing agreement among Scribner, Mrs. Wharton and the Davises [88] leads me to conclude that both arguments are inapplicable to the facts of this case. Under the agreement, the Davises and Mrs. Wharton—characterized as the "Authors and Proprietors"—transfer the American and Canadian publishing rights to the play for the entire original and renewal copyright periods and authorize Scribner "to take out the copyright on said work." Scribner was clearly more than a licensee. See Bisel v. Ladner, 1 F.2d 436 (3d Cir. 1924); Manning v. Miller Music Corp., 174 F.Supp. 192, 194–195 (S.D.N.Y.1959); Quinn-Brown Pub. Corp. v. Chilton Co., 15 F.Supp. 213 (S.D. N.Y.1936); Howell, Copyright Law 50–51 (Latman Rev. ed. 1962). Section 9 provides that "the author or proprietor of any work made the subject of copyright by this title, or his * * * assigns, shall have copyright for such work." Scribner was, therefore, a proper party to obtain copyright on the published version of the play.

However, a transfer of rights sufficient under section 9 to entitle someone to obtain copyright is not necessarily

"an assignment of the copyright"—the condition precedent to the recordation requirement of section 32. Indeed, the 1935 agreement could not have been "an assignment of the copyright" on the published version of the Davis play because no such copyright could have existed at that time, prior to publication. In fact, the third paragraph of the publishing agreement provides: "Said Authors hereby authorizes [sic] said Publishers to take out the copyright on said work." In this significant respect, the situation before me differs from that in the Winchell case relied on by defendants, and does not fall within the operation of section 32. Cf. Nom Music, Inc. v. Kaslin, 224 F.Supp. 922 (S.D.N.Y.1964), aff'd on other grounds, 343 F.2d 198 (2d Cir. 1965) (holding that section 32 does not apply to assignment of existing copyright on an unpublished work).

Moreover, even if the 1935 agreement is the type of assignment contemplated under section 32, that section has not been violated. The assignee's name has not been "substitute[d]" for the name of the assignor; both names appeared in the notice of copyright in the published version of the play. In this respect this case likewise differs from the facts in Winchell.

I have considered defendants' other arguments regarding the validity of the copyrights on the Davis play and the alleged infringement and consider them without merit or irrelevant. To sum up: based upon all of the evidence in the case and my judgment as to the credibility of witnesses, when appropriate, I find that the Davis play was duly copyrighted, plaintiff is the legal owner of the copyrights and the proper party plaintiff, all defendants received notice of plaintiff's claim, and all defendants infringed upon the copyrights [89] and are

87. Defendants' Trial Memorandum pp. 38–42.

88. Pl. Ex. 7.

89. It may be unnecessary to rule on whether the section 12 copyright on the unpublished version of the Davis play has been infringed. The question arises whether, when a work has been copyrighted initially as an unpublished work, a subsequent publication of the work and acquisition of a copyright thereon as a published work creates new rights against infringement or merely continues the

therefore liable for such infringement. The liability of DuPont and BBDO is discussed below.

## V

Defendants contend that even if the court holds that the Davis play has been infringed, the record does not disclose a basis for holding DuPont and BBDO liable.[90] Research discloses few cases ruling upon infringement liability of the sponsor of a television or radio broadcast or its advertising agency. Thus, the court is again faced "with a picture all too familiar in copyright litigation: a legal problem vexing in its difficulty, a dearth of squarely applicable precedents, a business setting so common that the dearth of precedents seems inexplicable, and an almost complete absence of guidance from the terms of the Copyright Act * * *." Shapiro, Bernstein & Co. v. H. L. Green Co., 316 F.2d 304, 305 (2d Cir. 1963). The question to be resolved, therefore, is what circumstances will render a sponsor of a television program and its advertising agency liable for the direct infringing acts of persons hired to produce the program.

In Select Theatres Corp. v. Ronzoni Macaroni Co., 59 U.S.P.Q. 288 (S.D.N.Y. 1943), one issue was defendant sponsor's liability for a radio broadcast of a play which infringed a copyrighted play. The court stated (59 U.S.P.Q. at 290):

> "[The infringing] play was broadcast on radio time contracted for by the Ronzoni Company and the broadcasts were sponsored by that company. The first broadcast commenced with the announcement * * * that 'The firm of Ronzoni, manufacturers of the best macaroni in America, takes pleasure in presenting * * [the play].' It engaged Caimi to produce and the International Broadcasting Corp. to broadcast the play. It therefore is liable."

In opposition to the Ronzoni case, defendants cite National Ass'n of Performing Artists v. Wm. Penn Broadcasting Co., 38 F.Supp. 531 (E.D.Pa.1941). In *National Ass'n*, holders of the copyright of certain musical compositions sought to enjoin a radio station and several advertisers from broadcasting the copyrighted music without permission. The issue of the sponsor's amenability to the requested injunction arose in the context of plaintiff's motion to remand the action to the state court from which it had been removed by defendants on diversity grounds. The court examined the relationship between the sponsors and the station. It found "that none of the defendant advertisers had the right to or did exercise any control over the determination of what records were to be

---

rights previously secured. There is "a paucity of case law" interpreting section 12, Warner, Radio and Television Rights § 72 at 236–37 (1953), and no decision precisely on point has been found. However, the rule that the period of the published copyright commences from the date of the unpublished copyright (see p. 623 supra) and dictum of the court of appeals in Patterson v. Century Productions, Inc., 93 F.2d 489, 491–492 (2d Cir. 1937), cert. denied, 303 U.S. 655, 58 S.Ct. 759, 82 L.Ed. 1114 (1938) (requirements of published copyright must be complied with for "continuing validity" of unpublished copyright) indicate that the earlier copyright does continue to have legal significance. At trial, plaintiff appeared to claim infringement of both copyrights, and defendants' coun-

sel appeared to question whether infringement of the first copyright was an issue (Tr. pp. 103–04). Despite this, defendants requested no adjournment and submitted Proposed Findings of Fact and Conclusions of Law, e. g., pp. 27, 28, consistent with a belief that infringement of both copyrights was in issue. Similarly, plaintiff's Brief after Trial, p. 32, and Proposed Findings of Fact and Conclusions of Law, pp. 21, 22, make clear that he seeks an adjudication of infringement of both copyrights. In view of the above, I make the finding of infringement of the first copyright, as well as the second. If this finding is surplusage, it may be disregarded.

90. The court reserved decision on motions to dismiss against these defendants after the opening statement. Tr. p. 10.

played. * * * In other words, choice and playing of the records were in all cases controlled exclusively by the defendant station." 38 F.Supp. at 532. Under these circumstances, the court ruled there was no basis to enjoin the advertisers; diversity jurisdiction could not, therefore, be defeated by making them parties. A claim of joint liability for infringement was characterized as "clearly unsound," the court stating (38 F.Supp. at 533):

> "Something other than the mere relation of advertiser and station operator must exist to support an action against the advertising defendants for violation of the plaintiff's property rights by programs broadcast by the station."

These cases are distinguishable from each other because the defendant sponsors apparently had different roles in relation to the infringing broadcasts. See also Robertson v. Batten, Barton, Durstine & Osborn, Inc., 146 F.Supp. 795 (S.D.Cal. 1956) (sponsor and advertising agency held liable for infringement of plaintiff's song by radio and television commercials).

Although the above cases dealt with broadcasts, a more recent decision of the Court of Appeals for the Second Circuit is even more significant on the precise issue here. In Shapiro, Bernstein & Co. v. H. L. Green Co., *supra,* the issue was H. L. Green Co.'s liability for sales by a concessionaire (Jalen) in the company's stores, without its knowledge, of unauthorized phonograph records. In ruling on H. L. Green Co.'s responsibility, the court refused to attach any significance to the technical classification of H. L. Green Co. and Jalen's relationship. Rather, the decision holding H. L. Green Co. liable rested on certain policy considerations thus expressed by Judge Kaufman (316 F.2d at 307):

> "When the right and ability to supervise coalesce with an obvious and

direct financial interest in the exploitation of copyrighted materials— even in the absence of actual knowledge that the copyright monopoly is being impaired * * *—the purposes of copyright law may be best effectuated by the imposition of liability upon the beneficiary of that exploitation."

Under the terms of the concession agreement H. L. Green Co. retained the ultimate right of supervision over the conduct of the record concession and its employees. Also, H. L. Green Co. was to receive a percentage of Jalen's gross receipts—in some cases ten per cent, in others twelve per cent—in lieu of rent. On these facts, the court concluded "that Green's relationship to its infringing licensee, as well as its strong concern for the financial success of the phonograph record concession, renders it liable for the unauthorized sales of the 'bootleg' records." 316 F.2d at 308. The court also indicated that imposition of vicarious liability on H. L. Green Co. would encourage those who similarly had power to police the conduct of others to exercise such power to avoid infringement.

I believe it proper to apply the essence of the *Green* decision to the issues of liability in this case. Therefore, the vicarious liability of DuPont or BBDO depends in plaintiff's proof that these defendants had some power to supervise the activities of the actual copyright infringers, and that their failure to exercise this power so as to prevent copyright infringement resulted in a financial benefit to them.

The testimony clearly establishes that DuPont, directly or through its agents (including BBDO), had to approve of several steps in the production of the television program. For example, DuPont, directly or through BBDO, had to consent to televising the story of Ethan Frome before work on the production was commenced.[91] Copies of the

---

91. Tr. pp. 56–57, 59, 71–72, 79–81, 86, 132–33, 691–93, 775. Defendant Susskind testified that he had been unsuc-

cessful in persuading sponsors in the past to authorize the story of Ethan Frome. Tr. p. 773; compare Tr. pp. 691–93.

first draft of the television script (which substantially represented the actual telecast) were sent to DuPont and BBDO, and their representatives sat in on story conferences.[92] On these facts, it seems logical to infer that DuPont had the ultimate power to determine content of the program and exercised that power through its agent BBDO. Compare Select Theatres Corp. v. Ronzoni Macaroni Co., *supra*. DuPont was not merely an advertiser buying time on a program produced by a station over whom it had no control. Compare National Ass'n of Performing Artists v. Wm. Penn Broadcasting Co., *supra*. Therefore, especially upon being informed of an impending violation of plaintiff's copyright,[93] DuPont was under a duty to exercise its power so as to insure against copyright violation.

The direct financial interest of DuPont and BBDO in the success of the infringing broadcast cannot be seriously questioned. The program was called "The DuPont Show of the Month";[94] DuPont advertised several products on the broadcast;[95] DuPont spent substantial sums to have the program produced and shown to a wide audience.[96] From these facts, it can be easily inferred that DuPont stood to benefit through increased sales of its products from favorable acceptance of a widely viewed telecast under its sponsorship. Naturally, BBDO had a financial interest in the increased sales of a client's products generated by an advertising package. Since plaintiff has proved that the broadcast infringed his copyright, it follows that a good part of the success enjoyed by the program stems from reliance on the Davis play. I conclude, therefore, that this infringement was of direct financial benefit to defendants DuPont and its agent BBDO.[97] Ac-

cordingly, I conclude that these defendants are also liable for infringing plaintiff's copyrights on the Davis play.

The foregoing constitutes the court's findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52. A decree, in accordance with these findings, may be settled on notice.

---

92. Tr. pp. 56–57, 71, 79–81.

93. Pl. Exs. 18, 19, 20, 23.

94. Def. Ex. H.

95. Tr. pp. 49–50.

96. Tr. pp. 43–44, 50.

97. Whether either a sponsor or its advertising agency need ever take a substantial financial risk of copyright infringement under these circumstances is, of course, another matter, determined by the facts as to indemnities and insurance. See Shapiro, Bernstein & Co. v. H. L. Green Co., supra, 316 F.2d at 309 and authorities cited therein.